718 A.2d 579

## MARYLAND BOARD OF PHYSICIAN QUALITY ASSURANCE

v.

### Stanley Z. FELSENBERG.

### No. 26, Sept. Term, 1998.

Court of Appeals of Maryland.

Oct. 2, 1998.

Thomas W. Keech, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Appellant.

Richard Butchok (Lisa J. Sansone, on brief), Baltimore, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

The dispute before us is principally one of statutory construction: whether two provisions of the Maryland Medical Practice Act—Maryland Code, § 14–404(a) and (b) of the Health Occupations Article—are inconsistent to the point that § 14–404(b) cannot be given effect as written. The Circuit Court for Baltimore County said "yes." We shall hold "no."

The Board of Physician Quality Assurance is currently the licensing and disciplinary agency for physicians in Maryland. Except as otherwise provided in the Medical Practice Act, a person is not allowed to practice medicine in this State without a license issued by the Board. Section 14–404(a) authorizes, but does not require, the board to reprimand a licensed physician, place a licensee on probation, or suspend or revoke a license to practice medicine for any of 36 enumerated reasons. Among the listed grounds for discipline are that the licensee:

"(3) Is guilty of immoral or unprofessional conduct in the practice of medicine;

. . .

(11) Willfully makes or files a false report or record in the practice of medicine;

. . .

(21) Is . . . convicted . . . by a court of any state or country . . . for an act that would be grounds for disciplinary action under this section; [or]

. . .

(23) Willfully submits false statements to collect fees for which services are not provided."

It is clear, and really undisputed, that, under paragraphs (21) and (23), the board is authorized to suspend or revoke the license of a physician who is convicted in a Federal court for a crime involving the willful submission of false statements to collect fees for which services were not provided.

Section 14–404(b) provides:

"(1) On the filing of certified docket entries with the Board by the Office of the Attorney General, the Board *shall* order the suspension of a license if the licensee is convicted of or pleads guilty or nolo contendere with respect to a crime involving moral turpitude, whether or not any appeal or other proceeding is pending to have the conviction or plea set aside.

(2) After completion of the appellate process if the conviction has not been reversed or the plea has not been set aside with respect to a crime involving moral turpitude, the Board *shall* order the revocation of a license on the certification by the Office of the Attorney General."

(Emphasis added.)

Appellee, Stanley Felsenberg, is a physician who was licensed by the board to practice medicine. On December 27, 1995, based on a guilty plea, Felsenberg was convicted in the United States District Court for the District of Maryland of one count of mail fraud—a violation of 18 U.S.C. § 1341.[1] The scheme alleged in the indictment was that Felsenberg submitted to various insurers false claims for medical and physical therapy services that he did not, in fact, perform. The indictment contained ten counts, each based on a separate submission; Count One involved a claim to GEICO Insurance Company for $1,248. The Statement of Facts filed by the Government in response to the guilty plea stated, in relevant part:

"The evidence would show that Dr. Felsenberg routinely had unlicensed secretarial and clerical employees perform physical therapy on his patients, and then billed the insurance companies as if he personally had performed the services. Moreover, on numerous occasions Dr. Felsenberg

---

**1.** Section 1341 provides, in relevant part, that anyone who, having devised a scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretenses, places any matter in a post office, to be delivered by the Postal Service, for the purpose of executing the scheme or artifice, is subject to five years imprisonment and a fine. Because the possible prison sentence exceeds one year, a violation of § 1341 is a felony under Federal law. *See* 18 U.S.C. § 1.

billed for services performed by him, when in fact he was on vacation and/or out of state at the date and time billed."

Although Count One involved only one claim for $1,248, the Statement of Facts alleged, and in his written plea agreement Felsenberg conceded, that he and his staff generated fraudulent claims of more than $200,000. Felsenberg agreed that he was, in fact, guilty of the offense and would so advise the court. In conformance with the plea agreement, Felsenberg was convicted on Count One. Sentencing was deferred pending a pre-sentence investigation report.[2]

The board has adopted regulations governing its procedure under both § 14–404(a) and § 14–404(b). Proceedings under subsection (a) cover a much greater variety of circumstances. Some of the grounds listed involve the failure to meet appropriate standards of medical care; others do not. Ones that do involve a failure to meet standards of medical care must be sent to the Medical and Chirurgical Faculty of the State of Maryland—the State medical society (Med Chi)—for investigation and peer review evaluation; further action by the board awaits a report from Med Chi. *See* § 14–401(c)(2) and (e)(3). COMAR 10.32.02.03C(9) provides that, after the service of charges filed under subsection (a), the board shall offer the respondent a "case resolution conference," which the regulation defines as "a voluntary, informal, and confidential proceeding to explore the possibility of a consent order or other resolution of the matter." The regulation continues that, "[i]f there is no basis for an agreement between the respondent and the administrative prosecutor, the matter proceeds to a hearing." The hearing is an evidentiary one conducted by an administrative law judge, who issues to the board written proposed findings of fact, proposed conclusions of law, and a proposed disposition. If timely exceptions are filed to the ALJ's proposals, the board conducts a hearing on those excep-

---

**2.** We are informed that Felsenberg was eventually sentenced to one year in prison and one year of supervised release, the first six months of which was to be in home detention. It is not clear from the record before us when the sentence was imposed.

tions; otherwise, the board issues its order based on the proposed findings and conclusions. COMAR 10.32.02.03F and G.

The procedure is different with respect to a petition filed under § 14–404(b)(1). Essentially what occurs is as follows:

(1) The Attorney General must provide the board with certified docket entries of the criminal court proceeding and "appropriate underlying documents of the certified court record relevant to the conviction, plea of guilty, or plea of nolo contendere." Those documents must include at least one of the following: a stipulated statement of facts or statement of facts on the record; the plea agreement containing agreed facts; a transcript of the plea agreement proceeding; a trial transcript; or a written opinion of the trial judge. COMAR 10.32.02.04B.

(2) The board must then determine whether (i) the documents provided to it indicate that the doctor "comes within the language and intent" of § 14–404(b), and (ii) the board "has a basis for finding preliminarily that [that section] applies to the respondent." If the board makes those preliminary determinations, it issues an order directing the doctor to show cause why the board should not take action under § 14–404(b). COMAR 10.32.02.04B(3).

(3) The respondent is permitted to show cause in writing "on the following issues: (a) Lack of conviction or plea; (b) Whether the crime is one involving moral turpitude; (c) Misidentity of the respondent with the defendant in the criminal matter; and (d) Other relevant issues, if any, other than mitigation." The respondent is also entitled to "request an opportunity to address the board by a limited evidentiary hearing on the same issues," but the regulation makes clear that an evidentiary hearing is discretionary with the board "based on the existence of genuine issues of material fact or law." COMAR 10.32.02.04D.

(4) After consideration of the respondent's answer, either in writing or at a hearing, the board "shall deliberate and determine whether the crime is a crime involving moral turpi-

tude, and then shall issue an appropriate order." COMAR 10.32.02.04G.

The procedure set forth in the regulation governing proceedings under § 14–404(b)(1) was followed in this case. On March 1, 1996, the Office of the Attorney General filed a petition with the board to suspend Felsenberg's license to practice medicine, alleging the conviction and asserting that mail fraud was a crime of moral turpitude. Accompanying the petition was a copy of the indictment, a certified copy of the docket entries showing the plea of guilty and its acceptance by the court, and a copy of a "Criminal Memo," stamped by the Clerk of the U.S. District Court, that confirmed the plea of guilty and its acceptance. In April, 1996, the Attorney General supplemented its submission by filing a copy of the plea agreement and a copy of the Government's Statement of Facts in support of the guilty plea. On March 5, 1996, the board issued an order directing Felsenberg, on or before April 5, to show cause why his license to practice medicine should not be suspended.

On April 12, Felsenberg filed an answer, admitting all substantive allegations in the petition other than that mail fraud was a crime of moral turpitude, which he denied. He urged, however, that the petition should have been filed under § 14–404(a)(3), (11), (21) or (23), and that, if that had been done, he would have been entitled "to an informal pre-hearing conference to resolve the matter." Such a conference, he argued, "would have been substantially less onerous, nonadversarial, in a less formal atmosphere, with informal discovery by both sides and the purpose thereof would have been for an amicable agreed resolution of the matters (in addition to the subsequent right to a hearing hereunder)." Contending that the failure to proceed under § 14–404(a) deprived him of equal protection of the law, Felsenberg asked that the petition be dismissed or that he be afforded the prehearing conference allowed under the regulation implementing § 14–404(a). He did *not* request an evidentiary hearing pursuant to COMAR 10.32.02.04D; nor did he present any evidence or argument in

support of his view that mail fraud was not a crime involving moral turpitude.

The Attorney General responded to the answer. With respect to whether mail fraud is a crime of moral turpitude, the Attorney General cited both prior decisions of the board and opinions of this Court involving attorney discipline, all to the effect that crimes involving fraud and deceit are crimes involving moral turpitude. The response also contested Felsenberg's right to a case resolution conference, pointing out that, under § 14–404(b)(1), the board had no discretion other than to suspend the license; there was nothing to conciliate. Felsenberg replied, on May 17, 1996, with further argument in support of his contention that the petition should have been filed under § 14–404(a), urging that, as a matter of both statutory construction and Constitutional imperative, § 14–404(b) applies only to crimes of moral turpitude that are not included under § 14–404(a) and that do not involve the practice of medicine. In an accompanying motion, Felsenberg asked, for the first time, for a hearing under COMAR 10.32.02.04D.

On June 24, 1996, the board, after a review of the documents and argument before it, denied Felsenberg's belated request for an evidentiary hearing and voted to suspend his license to practice medicine. In its Final Order, the board addressed and rejected each of the arguments made in Felsenberg's response and memorandum. It concluded that § 14–404(b) was the more specific, not the more general, provision, as it required a conviction of a crime of moral turpitude, and the board found no basis in the statutory language for the assertion that § 14–404(b) applied only to crimes not involving the practice of medicine. Citing *Attorney Grievance Comm'n v. Walman,* 280 Md. 453, 374 A.2d 354 (1977), for the proposition that moral turpitude involves intentional dishonesty for purposes of personal gain, the board held that (1) mail fraud is "a crime that involves fraud or a false statement or representation," and (2) the indictment, to which Felsenberg pled guilty, evidenced "a continuing course of conduct where Respondent billed for medical services not actually provided."

In denying the request for a hearing, the Board reasoned that "[b]ecause of the clear legislative intent to avoid providing a licensee with a forum to re-litigate the integrity of the underlying criminal judgment, as well as the lack of discretion in imposing a sanction, neither a settlement conference or an oral argument would influence the outcome of the disciplinary proceedings." Felsenberg was directed to surrender his license.

Felsenberg sought judicial review in the Circuit Court for Baltimore County, pressing the arguments made before the board and insisting that the Attorney General's petition should have been brought under § 14–404(a).[3] The court agreed with him. In an Opinion and Order filed July 23, 1997, the court declared that the board had erred as a matter of law in suspending the license. It concluded that subsections (a) and (b) were in facial conflict, in that conduct falling within subsection (a)(21) and (23) also fell within subsection (b). Because, in its announced view, subsection (a) was the more specific provision, it controlled over subsection (b). On that basis, the court held § 14–404(a)(21) and (23) "controlling in the case sub [judice] considering the nature of Petitioner's criminal charges; billing for services which Petitioner did not provide." The court reversed the board's order and remanded for further proceedings.

The board appealed, and, on our own initiative, we granted *certiorari* before argument in the Court of Special Appeals. We shall reverse the judgment of the circuit court.

## DISCUSSION

Contrary to the position he took before the board and in the circuit court, Felsenberg conceded in his brief filed in this Court that "the crime of mail fraud of which Dr. Felsenberg

---

3. With his petition for judicial review, Felsenberg moved for and obtained, *ex parte*, a stay of the Board's order, notwithstanding the clear mandate of § 14–408(c) of the Health Occupations Article that an order of the Board may not be stayed pending judicial review. When that, and certain procedural irregularities with the stay, were brought to the court's attention, the stay was dissolved.

was convicted" is a crime of moral turpitude. That leaves three issues: (1) whether there is a facial conflict between § 14–404(a) and § 14–404(b) that must, for some reason, be resolved in favor of subsection (a); (2) whether, to avoid that conflict, § 14–404(b) should be read, as a matter of statutory construction, to encompass only crimes of moral turpitude that do not involve the practice of medicine and that are not based on conduct falling within any of the enumerated categories in § 14–404(a); and (3) whether any other construction would deprive Felsenberg of his license to practice medicine without due process of law.

### *Statutory Construction Issues*

The two statutory construction issues interrelate; both stem from the alleged ambiguity arising from the fact that the conduct underlying Felsenberg's conviction might (or would) itself be grounds for discipline under one or more provisions in § 14–404(a). The question, precisely, is whether the Legislature intended for the conviction of a crime involving moral turpitude based on conduct subject to discipline under subsection (a) to be dealt with, exclusively, in accordance with subsection (a), rather than under subsection (b). In this context, where the issue depends less on the meaning of particular words or phrases than on the interplay between separate provisions, legislative history is a particularly fertile source for determining the legislative intent.

In 1888, to promote the public health and regulate the practice of medicine, the Legislature, apparently for the first time, required persons practicing medicine either to be a graduate of a "legally authorized medical college" or, if already practicing medicine, to complete such examination as the State Board of Health chose to give. If the person either had a proper diploma or passed the examination, the board issued a certificate, which entitled the person to practice medicine. Section 7 of the Act authorized the board to deny a certificate to "individuals guilty of unprofessional or dishonorable conduct or of criminal practice" and to "revoke certificates for like causes." 1888 Md. Laws, ch. 429.

In 1892, the Board of Health was replaced as the licensing agency by two separate boards of medical examiners—one "representing" and appointed by Med Chi and one "representing" and appointed by the Maryland State Homeopathic Medical Society of the State of Maryland. Either board could grant a license to practice medicine upon proof of graduation from a medical college and passage of an examination given by that board. Although the Act required that an applicant be of good moral character, it did not include the provision in the 1888 law permitting the board to deny or revoke a license upon proof of unprofessional or dishonorable conduct or criminal practice. 1892 Md. Laws, ch. 296.

A provision of that kind was restored in 1902, when the Legislature authorized the two boards to revoke a license for fraud or deception in passing the examination, habitual drunkenness, criminal abortion, conviction of a crime involving moral turpitude, or unprofessional or dishonorable conduct. 1902 Md. Laws, ch. 612. It was thus the 1902 law that first articulated the authority to revoke a license to practice medicine upon conviction of a crime involving moral turpitude, as opposed to the more general ground of "criminal practice." The law specified, however, that, before revoking a license, the board had to furnish the doctor with a copy of the charges and afford the doctor the opportunity for an evidentiary hearing. A decision to revoke a license was subject to judicial review.

That structure lasted until 1957, when the Legislature did away with the board representing the Homeopathic Medical Society and created one Board of Medical Examiners, all the members of which were selected by Med Chi, as the licensing agency. 1957 Md. Laws, ch. 29. The provisions regarding the revocation of licenses were left more or less intact, except that (1) insanity and addiction to narcotics were added as grounds for revocation, and (2) both the doctor and the board were authorized to appeal a decision of the circuit court, made on judicial review, to this Court. There was no provision, in either the 1902 law or the 1957 law, permitting the suspension of a license—only revocation following the opportunity for a hearing. The authority to suspend a license and place a

physician on probation was added in 1966. 1966 Md. Laws, ch. 209.

In 1968, the Legislature once again restructured the agency and, along with that restructuring, added several new grounds for suspending or revoking a license. 1968 Md. Laws, ch. 469. In place of the Med Chi-appointed Board of Medical Examiners, it created a nine-member Commission on Medical Discipline. Seven members were to come, directly or indirectly, from Med Chi, the Governor being free to appoint two other physicians. A new provision, however, required the commission to refer all cases coming to its attention to either Med Chi or the appropriate county medical society for investigation and report. The report was to contain "such recommendations as the investigation reveals might be necessary for adequate disciplinary procedures," and the commission was then to consider those recommendations. When the commission completed its investigation "according to the process outlined herein," it was authorized to dismiss the charges or to reprimand a physician, place him or her on probation, or revoke or suspend the license, for any of 18 enumerated reasons. Among those reasons were conviction of a crime involving moral turpitude, willfully making and filing false reports or records in the licensee's practice as a physician, and the filing of false statements for collection of fees for which services are not rendered. If the physician sought judicial review of an order suspending or revoking a license, the order was automatically stayed until final judgment was entered.

In 1970, the General Assembly split the licensing and disciplinary functions, creating an eight-member Board of Medical Examiners to handle the former and a nine-member Commission on Medical Discipline to handle the latter. 1970 Md. Laws, ch. 736. Med Chi remained in control of both agencies, electing all eight of the board members and having seven of the nine commissioners appointed directly or indirectly from its ranks. As in the preexisting law, all cases coming before the commission had to be referred for investigation to Med Chi or to a county medical society, and the commission was authorized only to act upon the report and recommendations

made by that body. The grounds for discipline remained essentially the same as were included in the 1968 Act, and, as before, any order of the commission suspending or revoking a license was automatically stayed pending judicial review.

By 1988, it became clear that the disciplinary scheme then in effect was unsatisfactory, leading the Governor to sponsor comprehensive legislation (Senate Bill 508) to change both the structure of the regulatory agencies and the procedures for disciplining errant physicians.

Testimony before the Senate Economic and Environmental Affairs Committee indicated that, due to the multiple referrals between the commission, Med–Chi, the Attorney General's Office, and the county medical societies, which created a complex flow-chart, it took approximately 11 months to dispose of the average consumer complaint and 15 months for final action on serious complaints. Those delays had produced a significant backlog of unresolved complaints against physicians. According to the Governor's Office, 695 cases were then being investigated by the commission and another 590 cases had been referred to the commission but had not yet been preliminarily reviewed and referred to Med Chi or a county medical society. *See* Senate Economic and Environmental Affairs Committee Bill Analysis on Senate Bill 508 (1988).

The bill did away with the two existing boards and replaced them with a new 15–member board, ultimately named the Board of Physician Quality Assurance, to perform both the licensing and disciplinary functions. Additional assistance from the Attorney General's Office was provided for, and, although the board was *permitted* to refer any case to Med Chi for investigation and peer review, it was *required* to refer to Med Chi only those cases involving standards of medical care, and then only after making its own preliminary investigation. The Legislature expressed its intent that all cases be resolved as expeditiously as possible and, in any event, within one year. 1988 Md. Laws, ch. 109.

A key feature of the bill, which remained intact throughout the legislative process, was the one at issue here. Section 14–504(a)(6) of the then-current law, *authorizing* the board to discipline a physician upon conviction of, or a plea of guilty or nolo contendere to, a crime involving moral turpitude, was repealed in favor of new § 14–504(b), *requiring* a suspension upon conviction or plea and a revocation after completion of any appellate process. That feature was highlighted in the testimony of both the Secretary of Health and Mental Hygiene and the Governor's Legislative Officer and also in the Revised Fiscal Note prepared by the Department of Fiscal Services. It was consistent with a model Medical Practice Act prepared by the Federation of State Medical Boards of the United States, of which the General Assembly had a copy. Section X of that model Act stated that the disciplinary board "should be authorized to summarily suspend a license prior to a formal hearing when . . . a licensee is convicted of a gross misdemeanor or felony, whether or not related to the practice of medicine, or enters a guilty or nolo contendere plea to a gross misdemeanor or felony charge."

The Legislature did not then go so far as the model Act recommended. Under the existing law, a doctor charged with having been convicted of a crime of moral turpitude was entitled to a contested case hearing before his or her license could be suspended or revoked. The 1988 legislation retained that right, although all hearings were to be before a hearing officer rather than the board itself. As enacted, § 14–504(b)(1) stated that "[s]ubject to the Administrative Procedure Act, the board shall order the suspension of a license if the licensee is convicted of. . . ." That changed two years later. By 1990 Md. Laws, ch. 237, the General Assembly deleted the introductory language in § 14–504(b)(1) and replaced it as follows (brackets indicating deletions and capitals indicating new language):

"[Subject to the Administrative Procedure Act] ON THE FILING OF CERTIFIED DOCKET ENTRIES WITH THE BOARD BY THE OFFICE OF THE ATTORNEY GENERAL, the Board shall. . . ."

The bill enacting that amendment was proposed by the Department of Health and Mental Hygiene. Its intent, as expressed in the Bill Analysis prepared by the Senate Economic and Environmental Affairs Committee, was to repeal the requirement "that the Board hold a separate administrative hearing when the Board formally charges a licensee who has been convicted of a crime of moral turpitude and allows the Board to charge the licensee on the submission of Certified Docket Entries by the Office of the Attorney General." *See* Senate Economic and Environmental Affairs Committee Bill Analysis of Senate Bill 138 (1990). The Bill Analysis noted that, under the existing law, the board was required to "formally charge a licensee who has been convicted of a crime of moral turpitude in a court of law, conduct a hearing, and decide on the appropriate disposition of the case" and also had to "hold a separate administrative hearing on the issue." The proposal, it said, "simplifies the current procedure by authorizing the Board to act based solely on the submission of Certified Docket Entries by the Office of the Attorney General."

The 1990 amendment put § 14–404(b) into its present form. There have been a number of amendments made since to § 14–404(a), but none of them changed what is now § 14–404(a)(3), (11), (21), or (23)—the paragraphs urged as being germane to this case.

The legislative history recounted above reveals a number of significant things relevant to Felsenberg's complaint of an inconsistency or conflict between § 14–404(a) and (b). As far back as 1888, the law allowed a physician's license to be revoked for either unprofessional or dishonorable conduct *or* criminal practice. It was possible, even then, if a doctor was convicted of a criminal offense that also constituted unprofessional or dishonorable conduct, to revoke the license either for the criminal conduct, established by the conviction, or for the underlying conduct, which would have to be proved in an administrative proceeding. Except for the ten years between 1892 and 1902, that ability to charge alternatively has remained in the law. The particular overlap complained of here

has existed since 1968. As noted, the law has allowed a license to be revoked upon conviction of a crime involving moral turpitude since 1902; in 1968, the Legislature authorized suspension or revocation upon a showing that the licensee filed false statements for collection of fees for which services were not rendered.

Had Felsenberg's conviction of mail fraud, based on mailing false statements for the fraudulent purpose of collecting fees for services not rendered by him, occurred between 1968 and 1988, he could have been charged with the conviction, with the underlying conduct, or with both. Had he been charged only with the conviction, the disciplinary agency would have been obliged to refer the matter to Med Chi and await a report from that society, but the only issues that likely could have been generated were those raisable under the current law: (1) whether there was a conviction; (2) whether Felsenberg was the person convicted; and (3) whether the crime was one involving moral turpitude.

All that the Legislature did through the 1988 and 1990 legislation was to carve out that limited category for expedited and summary disposition. It recognized in 1988 that, when the charge rests solely upon the conviction, there is no need to inquire into the underlying conduct and therefore no need for a referral to Med Chi. In 1990, it went further and determined that, in light of the limited scope of the issues raisable under such a charge, there was ordinarily no need for a mandated contested case hearing of any kind. The first two issues— whether there was a conviction and whether the licensee was the person convicted—are rarely contested and, if contested, are usually resolvable through documentary evidence. The very predicate of § 14–404(b)(1) would necessarily require at least a limited hearing if there is, indeed, a genuine dispute as to those issues, and, as noted, the COMAR regulations provide for an evidentiary hearing in that event. Here, of course, there was never any dispute that Felsenberg was convicted. Whether the crime is one involving moral turpitude is an issue which ordinarily may be resolved without the need for evidence or fact-finding.

The intent of the Legislature in directing summary treatment of a charge based on the conviction of a crime involving moral turpitude is clear. Although there may, in given circumstances, be an overlap, in that a charge could be brought under either subsection, we see no conflict or inconsistency between the two, and certainly none that would require declaring subsection (b) unenforceable. The fact that particular conduct is proscribed by two or more statutes does not mean that there is a conflict between them; nor does it ordinarily preclude a prosecution under any one of the statutes that applies, notwithstanding that the procedures or penalty applicable to that statute are more onerous than under another applicable statute. *See DiBartolomeo v. State,* 61 Md.App. 302, 486 A.2d 256 (1985) (person alleged to have committed fellatio can be charged with common law sodomy, statutory perverted practice, or statutory sex offense). The prevailing rule was well-stated in *Davis v. United States,* 385 A.2d 757, 759 (D.C.1978): "A defendant has no constitutional right to elect which of two applicable statutes will form the basis of his indictment and prosecution." *See also United States v. Greene,* 489 F.2d 1145 (D.C.Cir.1973), *cert. denied, Greene v. U.S.,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974); *U.S. v. Mitchell,* 39 F.3d 465 (4th Cir.1994), *cert. denied, Mitchell v. U.S.,* 515 U.S. 1142, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995). Because there is no conflict here, we need not address the various rules of statutory construction that normally might be applied to resolve such a conflict.

We turn, then, to Felsenberg's alternative statutory construction argument. Relying on (1) his asserted conflict between the two subsections, (2) *McDonnell v. Comm'n on Medical Discipline,* 301 Md. 426, 483 A.2d 76 (1984), and (3) the title to 1988 Md. Laws, ch. 109, he avers that § 14–404(b) should be read to include only those crimes involving moral turpitude that do not involve either the practice of medicine or conduct included within § 14–404(a). We find no merit to that argument.

The first prong of his argument is easily answered. For the reasons noted, we see no conflict between the two subsections.

As to the second, *McDonnell* has no relevance to this case. The sole issue raised there was whether an alleged attempt by Dr. McDonnell to intimidate two prospective witnesses scheduled to testify against him in a medical malpractice case constituted "immoral conduct of a physician *in his practice as a physician*" (emphasis added), and we said that it did not. Dr. McDonnell was never convicted of a crime and he was not charged with having been so convicted; the only question was whether his admittedly improper conduct was committed in his practice as a physician.

Felsenberg's title argument is based on the fact that the title to 1988 Md. Laws, ch. 109, describes the provision included as § 14–404(b) as "requiring the Board to suspend or revoke a license if the licensee is convicted or pleads guilty or nolo contendere to *certain* crimes of moral turpitude." (Emphasis added.) He points to the word "certain" as a word of limitation and draws from that a legislative intent to restrict § 14–404(b) to those crimes of moral turpitude not involving the practice of medicine and not otherwise covered under § 14–404(a). The word "certain" is commonly used in the titles to bills, usually to make the title sufficiently descriptive to assure compliance with Article III, § 29 of the Maryland Constitution. If the actual statutory language is ambiguous or susceptible to being construed in a limited way, the use of "certain" in the title may be taken into account, along with other things, in divining the legislative intent. It does not, however, of itself, serve to limit statutory language that is otherwise not so limited. The language of § 14–404(b), as enacted by the 1988 bill, is not limited; nor does the legislative history of that bill, recited above, suggest any legislative intent that it be limited.

### Due Process

Felsenberg's due process argument is rather brief. It is founded upon the notion that the right of a licensed physician to practice medicine "is a property right of which a physician cannot be deprived without due process of law." *Comm'n on Med. Discipline v. Stillman,* 291 Md. 390, 405, 435

A.2d 747 (1981). As we explained in *Aitchison v. State*, 204 Md. 538, 105 A.2d 495, *cert. denied*, 348 U.S. 880, 75 S.Ct. 116, 99 L.Ed. 692 (1954), however, that right is a conditional one, subject to the power of the State to protect and preserve the public health. Nonetheless, proceeding from the premise that he has a property right to practice his profession, he urges that the decision to charge him under § 14–404(b), rather than under § 14–404(a), was arbitrary, unreasonable, and oppressive, and, for that reason, violated his right to due process. Nowhere does he explain *how* the board's decision to follow the clear mandate of the statute was arbitrary, unreasonable, or oppressive. The ultimate answer to this challenge is the same as applies to his other complaints: The fact that a charge also might lie under § 14–404(a) based on the conduct underlying a conviction for a crime involving moral turpitude does not preclude the board from proceeding under § 14–404(b).[4]

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO AFFIRM ORDER OF BOARD OF PHYSICIAN QUALITY ASSURANCE; APPELLEE TO PAY THE COSTS.

---

**4.** In this regard, we see no distinction between a charge under § 14–404(a)(21) and a charge under any other provision of § 14–404(a). Paragraph (a)(21) allows discipline if the licensee "[i]s disciplined by a licensing or disciplinary authority or *convicted* or disciplined by a court of any state or country or disciplined by any branch of the United States uniformed services or the Veterans' Administration for an act that would be grounds for disciplinary action under this section." (Emphasis added.) That paragraph is principally designed to allow the board to take cognizance of orders and judgments rendered by agencies and courts of other jurisdictions. As worded, however, it is not the equivalent of § 14–404(b), as it necessarily requires an examination of whether the basis of the foreign disciplinary order or conviction was an act "that would be grounds for disciplinary action under this section." That may well require an evidentiary hearing. It goes beyond the purely legal question of whether a crime is one involving moral turpitude.