921 A.2d 893

Edward **CORNFELD**

v.

**STATE BOARD OF PHYSICIANS.**

No. 0175 Sept. Term, 2006.

Court of Special Appeals of Maryland.

May 2, 2007.

458

460

Lisa O'Mara Arnquist, Towson, MD, for Appellant.

Kathleen A. Ellis (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, MD, for Appellee.

Panel: ADKINS, KRAUSER, and THEODORE G. BLOOM, (Retired, Specially Assigned), JJ.

ADKINS, Judge.

State Board of Physicians (the Board) found that appellant Edward Cornfeld, M.D. (1) violated the standard of care in his treatment of a surgical patient by leaving her under anesthesia and "unattended in the operating room[,]" and (2) engaged in unprofessional conduct in the practice of medicine by misrepresenting to both a hospital peer review investigator and the Board that improper settings on the surgical instrument he used were not made to his specifications. The Board suspended Dr. Cornfeld's license to practice medicine until he satisfied certain conditions, and imposed a three year probationary period thereafter. The Circuit Court for Baltimore City affirmed the Board's order. Cornfeld appeals, raising five issues for our review, which we rephrase as follows:

I. Did the Board err in concluding that Dr. Cornfeld engaged in unprofessional conduct "in the practice of medicine" by making misrepresentations during hospital peer review and Board investigations?

II. Did the Board violate section 14–401(i) of the Medical Practice Act by failing to complete its investigation within 18 months, or to explain its delay, requiring dismissal of the complaint against Cornfeld?

III. Is the Board's conclusion that Dr. Cornfeld violated the standard of care by leaving an anesthetized patient unattended in the operating room supported by substantial evidence?

IV. Is the sanction imposed by the Board "so disproportionate to the alleged offense as to constitute arbitrary and capricious agency action"?

V. Did the administrative law judge abuse her discretion by excluding certain evidence offered by Dr. Cornfeld?

We shall hold that Dr. Cornfeld's false statements to hospital peer reviewers and Board investigators constituted "professional misconduct in the practice of medicine." Finding substantial evidence to support the Board's decision, no abuse

of discretion, and no error of law, we shall affirm the judgment.

## STATUTORY SCHEME GOVERNING
## PHYSICIAN DISCIPLINE

In Maryland, physicians are governed by the Medical Practice Act ("the Act"), *codified at* Md.Code (1981, 2005 Repl.Vol., 2006 Cum.Supp.), § 14–101 *et seq.* of the Health Occupations Article (HO). The Act is administered by the Board,[1] which has both licensing and disciplinary responsibilities. *See* HO § 14–205, § 14–206, § 14–313. In performing these duties, the Board has adopted regulations. *See* Code of Maryland Regulations ("COMAR") 10.32.02.

Under the Act, the Board has authority to discipline physicians for enumerated reasons. Section 14–404(a) identifies 40 specific bases for disciplinary action, two of which explicitly pertain to conduct committed "in the practice of medicine." Section 14–404(a)(3) permits the Board to discipline a licensee who "[i]s guilty of immoral or unprofessional conduct in the practice of medicine[.]" Section 14–404(a)(11) authorizes discipline of a physician who "[w]illfully makes or files a false report or record in the practice of medicine[.]" In addition, section 14–404(a)(22) allows disciplinary action against a licensee who "[f]ails to meet appropriate standards as determined by appropriate peer review for the delivery of quality medical and surgical care performed in [a] . . . hospital[.]"

In *Md. Bd. of Physicians v. Bernstein,* 167 Md.App. 714, 719–21, 894 A.2d 621 (2006), we detailed the Board's process for investigating and adjudicating complaints against physicians, and the ensuing process of judicial review.

---

1. Before July 1, 2003, the Board was known as the State Board of Physician Quality Assurance. *See* 2003 Md. Laws, ch. 252. For a thorough history of Maryland's regulation of the medical profession prior to that amendment, including the provenance of the provisions at issue in this appeal, *see Md. Bd. of Physician Quality Assurance v. Felsenberg,* 351 Md. 288, 297–302, 718 A.2d 579 (1998) (Wilner, J.).

The Act authorizes the Board to reprimand a licensed physician, place a licensee on probation, or suspend or revoke a license to practice medicine for enumerated reasons. . . . When an allegation that may constitute grounds for disciplinary action under the Act comes to the Board's attention, the Board generally initiates an investigation. HO § 14–401(a); COMAR 10.32.02.03A. If the allegation concerns the standard of care and, after an investigation, the Board elects to pursue further investigation, the Board then refers the complaint to the Medical and Chirurgical Faculty of Maryland ("Med Chi") physician peer review. HO § 14–401(c)(2); COMAR 10.32.02.03(B)(1).

The Board and Med Chi have adopted a "Peer Review Handbook" that governs the peer review process. Med Chi prepares a report addressing the allegations against the physician and submits it to the Board.

After receiving the Med Chi report, the Board determines whether reasonable cause exists to charge the physician with a failure to meet appropriate standards of care. COMAR 10.32.02.03(B)(2). If the Board files a charge, it refers the matter to an administrative prosecutor and sends notice to the physician. COMAR 10.32.02.03(C)

At that point, the physician is entitled to a contested case hearing before an administrative law judge ("ALJ"), in the Office of Administrative Hearings ("OAH"), pursuant to the Administrative Procedure Act, Md.Code (1984, 1999 Repl. Vol.), section 10–201 et seq. of the State Government Article ("SG"). HO § 14–405(a); *see also* COMAR 10.32.02.03(D). Following the hearing, the ALJ issues findings of fact, conclusions of law, and a proposed disposition. COMAR 10.32.02.03(E)(10). . . . Either party may file exceptions to the ALJ's findings and proposed disposition. COMAR 10.32.02.03(F).

The Board is not bound by the decision of the ALJ. After receiving the ALJ's proposed decision, the Board must review the record and the ALJ's proposal, and hold a hearing on any exceptions. COMAR 10.32.02.03(F). It then issues a final decision stating its findings of facts,

conclusions of law, and a disposition of the charge. COMAR 10.32.02.03(E)(10).

The Board's final decision is subject to judicial review in the circuit court in accordance with the Administrative Procedure Act, and then to appeal to this Court. HO § 14–408(b). (Footnotes and some citations omitted.)

*See also Md. Bd. of Physicians v. Elliott,* 170 Md.App. 369, 907 A.2d 321 (reviewing standards for appellate review of Board decision overruling ALJ), *cert. denied,* 396 Md. 12, 912 A.2d 648 (2006).

## FACTS AND LEGAL PROCEEDINGS

We recount the facts as they were found by the Board.[2] Dr. Cornfeld practices obstetrics and gynecology. On October 28, 1999, he performed a Loop Electrosurgical Excision Procedure (LEEP) on a 31 year old patient admitted to Montgomery General Hospital (MGH), in order to remove abnormal cervical tissue. The patient was placed under general anesthesia for the procedure.

The excision procedure is performed with a Bovie machine, which is a surgical instrument that heats up a fine metal wire shaped into a loop, which in turn is connected to a "Bovie pencil." The pencil and loop are inserted through the vagina to remove abnormal tissue.

Dr. Cornfeld had a card on file at MGH stating that his preference was to have the Bovie machine set at 70 for coagulation and 70 for cervical conization ("cutting") procedures such as the one he performed that day. But the operating room nurse responsible for overseeing the equipment and patient preparation that day, Sheryl Dickey, initially set the Bovie machine at 50 for both coagulation and cutting, in accordance with standard settings used in most procedures. Dr. Cornfeld instructed Ms. Dickey to change both settings to 70, and she did so.

---

2. Dr. Cornfeld does not allege any factual error.

During the procedure, Dr. Cornfeld burned the patient twice, causing a laceration of approximately 6 centimeters. He repaired this with two large Vicryl stitches.

Nurse Dickey notified a nurse supervisor who was in the operating room, Joan Fitzgerald, of the burn and sutures. After observing the burn, Fitzgerald left the operating room to consult a supervisor. When Dr. Cornfeld announced that he had concluded the procedure, Nurse Dickey asked the anesthesiologist not to wake the patient because another surgeon would be coming in to review the patient. Nurse Fitzgerald returned and advised Dr. Cornfeld that she had been instructed to have another physician check the patient before she left the operating room. Dr. Cornfeld replied, "Do what you need to do," then left the operating room. No other surgeon was in the operating room at the time. It was at least two to three minutes before Dr. Thomas Vincent arrived.

Dr. Vincent reviewed the patient, removed the sutures, and resutured the laceration with smaller sutures. After concluding the repair, Dr. Vincent located Dr. Cornfeld, explained what he had done, and asked Dr. Cornfeld what had happened. Dr. Cornfeld discussed the case with Dr. Vincent while the patient was in recovery. The patient did not suffer any severe or long-term effects from the laceration or suturing.

MGH suspended Cornfeld's hospital privileges shortly after the incident. In July 2000, in a peer review investigation by the hospital, Dr. Cornfeld stated under oath:

> I don't think anybody in our department ever sets a bovie at 70 or a cautery at 70 as a starting point. I haven't heard that they did. . . . I thought it was routine that when I would come in this thing would be set at 40 or 50.

Following its investigation and peer review, the hospital revoked Dr. Cornfeld's privileges.

The Board initiated an investigation in January 2000. In February 2000, through his attorney, Dr. Cornfeld filed written and signed responses to the Board's inquiry, stating:

The nurse who operates this machine was negligent in setting the machine to a heat of seventy to eighty whereas the appropriate setting used by Dr. Cornfeld is forty. Dr. Cornfeld has performed this surgery on many occasions at [MGH] and at other hospitals. Dr. Cornfeld has standing instructions for the setting of forty, and in every Leep Cone Biopsy, other than this one, the nurse operating the machine has set it to forty without specific instructions from Dr. Cornfeld other than the standing instructions.

The Board filed charges against Dr. Cornfeld in November 2003, alleging both violations of standards of care and unprofessional conduct in the practice of medicine. The three alleged violations of the standard of care in treating the patient consisted of the following:

1. Setting the Bovie machine too high for patient safety; Performing an inadequate repair of the laceration caused by the burn; and

2. Leaving an anesthetized patient unattended by another surgeon in the operating room.

After an evidentiary hearing, an administrative law judge initially found that Dr. Cornfeld breached all three standards of care applicable to these charges. After hearing and exceptions, however, the Board concluded that "[t]he clear and convincing evidence demonstrates only that Dr. Cornfeld left an anesthetized patient unattended in the operating room and thus violated section 14–404(a)(22)."

The Board's separate charge of "unprofessional conduct in the practice of medicine" was based on Cornfeld's statements regarding his instructions for settings on the Bovie machine. These were made to the hospital during its peer review investigation, and to the Board during its investigation and disciplinary proceedings. The ALJ concluded that these statements were misrepresentations because Dr. Cornfeld had standing instructions to set the Bovie machine at 70, and specifically instructed Nurse Dickey to increase the setting from 50 to 70 before the procedure in question began. Because Dr. Cornfeld's misrepresentations were made during the

hospital peer review and Board investigation, however, the ALJ determined that they did not fall within "the practice of medicine."

The Board sustained the State's exception to that conclusion, determining that Dr. Cornfeld's misrepresentations during hospital peer review and Board proceedings occurred in the practice of medicine, and violated HO section 14–404(a)(3). The Board reasoned that "[b]oth MGH's and the Board's investigations involved the manner in which Dr. Cornfeld practiced medicine" and "the manner in which he had treated a patient." In support, it cited its own precedents that making a false application or submitting false testimony for a Board proceeding are "clearly within the practice of medicine."

The Board sanctioned Dr. Cornfeld by revoking his license to practice medicine until he satisfied certain enumerated conditions, including obtaining "a neuropsychological evaluation" and report, undergoing "a psychiatric evaluation" and therapy as recommended, and completing an "ethics course," all of which would be selected and reviewed by the Board. Once his suspension lifts, Dr. Cornfeld would continue on probation for three years, during which his practice is subject to "Board review and peer review" at the Board's discretion.

## DISCUSSION

### Review Of Board's Decision

The standards governing judicial review of the Board's decision regarding Dr. Cornfeld are set forth *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–69, 729 A.2d 376 (1999):

> A court's role in reviewing an administrative agency adjudicatory decision is narrow; it is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.

In applying the substantial evidence test, a reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court must review the agency's decision in the light most favorable to it; the agency's decision is prima facie correct and presumed valid, and it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence.

Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected. (Internal quotation marks and citations omitted.)

*See also* Md.Code (1984, 2004 Repl.Vol., 2006 Cum.Supp.), § 10–222(h) of the State Government Article (court may affirm, remand for further proceedings, reverse, or modify Board's decision if it is affected by an error of law, unsupported by substantial evidence, arbitrary or capricious).

## I.

### Unprofessional Conduct "In The Practice Of Medicine"

As detailed above, the Board may sanction a physician who is "guilty of immoral or unprofessional conduct *in the practice of medicine*" or "willfully makes or files a false report or record *in the practice of medicine.*" HO § 14–404(a)(3), § 14–404(a)(11) (emphasis added). The practice of medicine is statutorily defined as follows:

(*l*) *Practice medicine.*—(1) "Practice medicine" means to engage, with or without compensation, in medical:

(i) Diagnosis;

(ii) Healing;

(iii) Treatment; or

(iv) Surgery.

(2) "Practice medicine" includes doing, undertaking, professing to do, and attempting any of the following:

(i) Diagnosing, healing, treating, preventing, prescribing for, or removing any physical, mental, or emotional ailment or supposed ailment of an individual:

1. By physical, mental, emotional, or other process that is exercised or invoked by the practitioner, the patient, or both; or

2. By appliance, test, drug, operation, or treatment. . . . ;

HO § 14–101(*l*).

Dr. Cornfeld argues that the Board "committed legal error" when it concluded that his misrepresentations to MGH and the Board occurred in "the practice of medicine." [3] He asserts that this case is "controlled by the Court of Appeals' 1984 ruling in *McDonnell v. Comm'n on Medical Discipline*, 301 Md. 426, 483 A.2d 76 (1984)," which construed the practice of medicine to exclude physician misconduct involving a civil malpractice trial, rather than by its later decisions in *Banks,*

---

**3.** The Board charged and found Dr. Cornfeld guilty of "professional misconduct," evidently treating his "making [of] a false report or record" as a species of "professional misconduct." Cornfeld does not argue that the Board erred in disciplining him for "professional misconduct" under subsection 14–404(a)(3), rather than for "making a false report or record" under subsection 14–404(a)(11). Both of these subsections require a showing that the misconduct occurred "in the practice of medicine." Dr. Cornfeld's challenge in this Court is limited to whether his misconduct occurred "in the practice of medicine." Therefore, we assume *arguendo* that misconduct chargeable under subsection 14–404(a)(11) may alternatively be disciplined under subsection 14–404(a)(3). *See generally Felsenberg,* 351 Md. at 304, 718 A.2d 579 ("The fact that particular conduct is proscribed by two or more statutes does not . . . . ordinarily preclude a prosecution under any one of the statutes that applies").

354 Md. at 76, 729 A.2d 376, and *Finucan v. Md. Bd. of Physician Quality Assurance*, 380 Md. 577, 846 A.2d 377, *cert. denied*, 543 U.S. 862, 125 S.Ct. 227, 160 L.Ed.2d 103 (2004), in which the Court more broadly described the practice of medicine in ruling that it may encompass sexual misconduct toward patients and co-workers. We disagree.

## *McDonnell, Banks,* and *Finucan*

In *McDonnell,* the Court of Appeals reversed a ruling that a physician's efforts to influence expert witnesses who were scheduled to testify against him in a medical malpractice trial[4] constituted sanctionable conduct in the practice of medicine, within the meaning of the predecessor to current section 14–404(a)(3). *See McDonnell,* 301 Md. at 437, 483 A.2d 76. Dr. McDonnell's inappropriate contacts are detailed in *Meyer v. McDonnell,* 40 Md.App. 524, 525–26, 392 A.2d 1129 (1978). The first interference occurred during trial and resulted in the witness refusing to testify.[5] The second incident occurred

---

4. In that case, this Court reversed the defense verdict in the underlying medical malpractice action on the ground that the patient was entitled to an instruction that the jury could consider evidence regarding McDonnell's intimidation to be evidence of McDonnell's "consciousness of the weakness of his case." *See Meyer v. McDonnell,* 40 Md.App. 524, 534, 392 A.2d 1129 (1978).

5. On the fourth day of the medical malpractice trial, McDonnell

 directed his secretary to call Dr. Robert P. Keyser, of Miami, Florida, an acquaintance and a fellow member of the American Scoliosis Society, and tell him that Dr. Robert B. Nystrom was scheduled to testify against appellee and that his testimony would be transcribed and disseminated to Dr. Nystrom's local medical society in Miami and to the American Academy of Orthopedic Surgeons. The secretary immediately carried out such a call, .... then requested that Dr. Keyser [call] before Dr. Nystrom testified, and gave him the phone numbers of both trial counsels and the trial judge. Just before noon on that same day, Dr. Keyser telephoned Dr. Nystrom, who was in the City Bar Library awaiting commencement of his testimony. Dr. Keyser, who was a mentor of Dr. Nystrom and a man whom Dr. Nystrom admired and respected, related the information about dissemination of testimony, and, with the preface that "this is not a threat, but," admonished him to tread lightly.... Dr. Nystrom was intimidated by the communication and felt that he would be unable to testify with a normal degree of candor.

after McDonnell became "incensed" at the testimony of another expert witness.[6]

The *McDonnell* Court specifically rejected the Attorney General's argument that such misconduct "was inextricably related to the practice of medicine" because it "occurred in the utilization of his medical office and while he was acting as a physician[.]" *See id.* at 433–34, 483 A.2d 76. Reviewing the language of the statute, the Court of Appeals observed that the legislature

> expressly outlined and defined nineteen forms of physician misconduct, some of which had no immediate connection with the diagnosis, care or treatment of patients or the practice of medicine, such as habitual intoxication, conviction

---

*Id.* at 525–26, 392 A.2d 1129.

6. McDonnell testified that he asked a friend to deliver a message to another of the plaintiff's experts. Specifically, McDonnell

> telephoned his friend and colleague, Dr. William H.M. Finney, a Baltimore neurosurgeon. He asked Dr. Finney to call Dr. Thomas H. Langfitt, ... a long-time friend of Dr. Finney, and advise him that Dr. Francis J. Pizzi was scheduled to testify against appellee and that his testimony would be transcribed and disseminated to his local medical society in Trenton, New Jersey. Dr. Finney made such a call that same evening, advising Dr. Langfitt that Dr. Pizzi['s] ... testimony would be disseminated, and that it might not be a particularly good thing for Dr. Pizzi to testify in an out of state medical malpractice trial with an impending appearance before the American Board of Neurological Surgery for the oral portion of his certification examinations.

> Dr. Langfitt ... reached Dr. Pizzi by telephone at his home and relayed the information conveyed by Dr. Finney, including the admonition as to the impending oral Board examinations. Dr. Langfitt was the person responsible for bringing Dr. Pizzi into neurosurgery. He also trained Dr. Pizzi who characterized him as "very important to me," and a person whom he admired and respected. Dr. Pizzi expressed to Dr. Langfitt that he was fearful that he might now be blackballed by the Board as a result of false information which may have been spread about him as a "violator of the conspiracy of silence," but that his evaluation of the case was objectively correct and that he felt committed to give an honest opinion in testimony. Dr. Langfitt told him to let his conscience be his guide with regard to continuing his testimony, but that they would have to "sit down and talk about a few things afterward."

> *Id.* at 527–28, 392 A.2d 1129.

of a crime of moral turpitude, or the personal use of illegal drugs. In only two of the nineteen described types of misconduct are the disciplinary infractions explicitly limited to a physician's act "in his practice as a physician," i.e.:
"(8) Immoral conduct of a physician in his practice as a physician.
(9) Willfully making and filing false reports or records, in his practice as a physician."
*Id.* at 435–36, 483 A.2d 76.[7]

For this reason, the *McDonnell* Court concluded, "it is not any immoral conduct of a physician, or any willful filing of a false report which constitutes 'unprofessional conduct'; rather, the misconduct must occur in the physician's 'practice as a physician.'" *Id.* at 435, 483 A.2d 76. Given the "punitive aspect" of the Board's disciplinary proceedings, and that the legislature intended these provisions to reach only immoral conduct that is "directly tied to the physician's conduct in the actual performance of the practice of medicine, *i.e.,* in the diagnosis, care, or treatment of patients.[,]" the Court held that the statutory language "should be strictly construed against the disciplinary agency." *Id.* at 436–37, 483 A.2d 76. Thus, conduct that has merely "a general or associative relationship to the physician in his capacity as a member of the medical profession" is not sanctionable by the Board. *Id.* at 437, 483 A.2d 76. Applying this view of the statute, the Court of Appeals concluded that, although "Dr. McDonnell's act in initiating the improper phone calls was related to his professional practice," the calls were "not done in the course of the actual practice of medicine[.]" *Id.*

In *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 71, 729 A.2d 376 (1999), the Court of Appeals affirmed the

---

7. Current HO subsections 14–104(a)(3) and 14–404(a)(11) set forth the revised and recodified version of this statute. After *McDonnell,* the legislature expanded the misconduct provision to explicitly include "unprofessional and immoral misconduct[.]" *See Dr. K. v. State Bd. of Physician Quality Assurance,* 98 Md.App. 103, 109, 632 A.2d 453 (1993), *cert. denied,* 334 Md. 18, 637 A.2d 1191, *cert. denied,* 513 U.S. 817, 115 S.Ct. 75, 130 L.Ed.2d 29 (1994).

Board's decision that a physician's sexual harassment of hospital employees occurred in the practice of medicine. The doctor argued unsuccessfully that "none of his conduct [was] within the practice of medicine because, when it occurred, he was not diagnosing, treating or evaluating patients," but "merely 'chatting or socializing with co-workers.'" *Id.* Following courts elsewhere, the Court of Appeals rejected such "an extremely technical and narrow definition of the practice of medicine." *See id.* at 74, 729 A.2d 376. The *Banks* Court reasoned that limiting section 14–404(a)(3) to misconduct that occurs "in a non-clerical task" committed "in the immediate process of diagnosing, evaluating, examining, or treating a patient" "would lead to unreasonable results and render the statute inadequate to deal with the many situations which may arise." *Id.* at 73, 729 A.2d 376.

Instead, the Court concluded, the touchstone for determining whether misconduct occurred "in the practice of medicine" must be whether it was "sufficiently intertwined with patient care" to pose a threat to patients or the medical profession. *See id.* at 76–77, 729 A.2d 376. When the misconduct occurs "in a hospital setting," the answer to that question is one the Board "is particularly well-qualified to decide[.]" *Id.* at 76, 729 A.2d 376.

The Board could reasonably hold that Dr. Banks's conduct of sexually harassing hospital employees was within the practice of medicine **because he was on duty and in the working areas of the hospital. When on duty, Dr. Banks was responsible for admitting patients, caring for patients, and assisting in the operating room and emergency department. . . . When Dr. Banks was on duty he was there for the purpose of practicing medicine;** *i.e.,* **for the "diagnosis, care, or treatment of patients." Dr. Banks sexually harassed his co-workers who were present in the working areas of the hospital in connection with the practice of medicine.** This conduct has more than merely a "general or associative relationship" to Dr. Banks's capacity as a member of the medical profession. The connection to the practice of medicine was sufficient for the Board to

conclude that it is "in the actual performance of the practice of medicine."

*Id.* at 72–73, 729 A.2d 376 (emphasis added).

Of particular interest to this appeal is the manner in which the *Banks* Court distinguished *McDonnell.*

We agree with the Board that this case is distinguishable from *McDonnell.* **In *McDonnell,* the physician's conduct occurred during judicial proceedings against him based upon conduct constituting malpractice. His conduct did not occur in the workplace where he was present for the purpose of practicing medicine.**

*Id.* at 72, 729 A.2d 376 (emphasis added).

In its most recent decision interpreting the "practice of medicine" language in section 14–404(a), the Court of Appeals held that a physician's misconduct in engaging in consensual sexual relations with patients under his care occurred in the practice of medicine. In *Finucan v. Md. Bd. of Physician Quality Assur.,* 380 Md. 577, 597, 846 A.2d 377 (2004), the Court reiterated its holding in *Banks* "that if the physician's misconduct relates to the effective delivery of patient care, the misconduct occurs in the practice of medicine." It again rejected a "narrow interpretation" of "the practice of medicine," this time dismissing arguments that the Board's authority to sanction misconduct is limited to actions while the physician is " 'on duty' in medical environs," or to actions that "reflect[ed] adversely on his technical skills as a physician." *See id.* at 598, 601, 846 A.2d 377. To the contrary, the Court reasoned, misconduct need not "raise doubts about the individual's grasp of particular technical skills." *Id.* at 601, 846 A.2d 377. It is enough that the misconduct "indicate[s] unfitness to practice medicine" by "rais[ing] reasonable concerns that an individual abused . . . the status of being a physician in such a way as to harm patients or diminish the standing of the medical profession in the eyes of a reasonable member of the general public." *Id.* at 601, 846 A.2d 377.

Quoting our opinion, Judge Harrell pointed to "four particularly cogent points" supporting the Board's conclusion that Dr.

Finucan's misconduct was intertwined with patient care in such a manner that it posed a threat to his patients and "diminishe[d] the standing of the medical profession as caregivers." *See id.* at 598, 601, 846 A.2d 377. Specifically, Finucan's sexual relationships (1) "grew directly out of ... and were entangled with" his physician-patient relationships, (2) "exploited, to his own ends, the trust that his patients placed in him as their physician[,]" (3) "risked losing ... the objectivity that any physician must have when caring for patients[,]" and (4) "damaged his patients emotionally." *Id.* at 598–99, 846 A.2d 377.

### Dr. Cornfeld's Contentions

Relying on *McDonnell,* Dr. Cornfeld argues that the responses he gave to hospital and Board investigators [8] concerning what happened in the MGH operating room on October 28, 1999 did not constitute "the practice of medicine." In Cornfeld's view, his misconduct, like Dr. McDonnell's, did not occur "in the practice of medicine" because it "took place in the context of 'judicial proceedings' against the doctor due to allegations of inappropriate medical care." The doctor argues that the Board erred "in suggesting that in issuing *Banks* the Court of Appeals intended to so dramatically broaden the definition of the phrase 'practice of medicine' to encompass facts such as presented in this case."

To be sure, unlike *Finucan* and *Banks,* the misconduct in this instance does not consist of predatory sexual behavior involving patients or hospital co-workers. Moreover, like *McDonnell,* this case involves misconduct that occurred during proceedings that arguably "adjudicated" the medical propriety of Dr. Cornfeld's care. In light of the Court of Appeals'

---

8. The Board has established "peer review" procedures by which "physicians within the involved medical specialty" evaluate "acts of medical or surgical care," as part of the Board's investigation into allegations of grounds for disciplinary action. *See* HO § 14–401(c)(2), HO § 14–401(e), COMAR 10.32.02.02(20), COMAR 10.32.02.03.B. We shall refer to this type of evaluation for disciplinary purposes as "Board investigation," in order to distinguish it from the type of peer review conducted by hospitals for quality of care purposes.

rejection of a "narrow view" of the practice of medicine in both *Banks* and *Finucan,* however, we do not agree with Dr. Cornfeld that *McDonnell* so narrowly defined the practice of medicine that it necessarily excludes professional misconduct during hospital peer reviews and Board disciplinary proceedings.

The discussion in *McDonnell* of what constitutes the practice of medicine was limited. The Court of Appeals' analysis simply stated that it must be "directly tied to the physician's conduct in the actual performance of the practice of medicine, *i.e.,* in the diagnosis, care, or treatment of patients[.]" *McDonnell,* 301 Md. at 435, 483 A.2d 76. We find nothing in *McDonnell* to suggest that all misconduct during an adjudicative proceeding is necessarily excluded from the "practice of medicine," or that a physician's dishonesty during hospital peer review and Board investigation of patient care cannot be "directly tied to" his practice of medicine.

Moreover, *McDonnell* is factually distinguishable in critical respects. Dr. McDonnell's misconduct consisted of interfering with prospective witnesses in a medical malpractice trial involving his former patient. He initiated improper phone calls from his medical office, in an effort to influence testimony by fellow physicians, by warning them that there would be professional consequences for testifying against him. But McDonnell did not discuss his diagnosis or treatment of any patient. *See id.* at 429–30, 483 A.2d 76; *Meyer,* 40 Md.App. at 525–27, 392 A.2d 1129. Thus, his misconduct did not occur in the practice of medicine, because it did not concern patient care issues and did not involve the exercise of McDonnell's judgment as a physician.

█ In its subsequent decisions in *Banks* and *Finucan,* the Court of Appeals examined in greater detail the scope and policies underlying the standard it articulated in *McDonnell.* Explicitly rejecting a "narrow view" of the "practice of medicine[,]" the Court emphasized that the nature and effect of a particular act of professional misconduct determines whether it occurred in the practice of medicine. Misconduct reason-

ably may be considered to be in the practice of medicine when it "relates to the effective delivery of patient care[.]" *See Finucan,* 380 Md. at 597, 846 A.2d 377; *Banks,* 354 Md. at 74, 729 A.2d 376. Such a relationship may be established by evidence that the physician abused his status as a physician in a manner that either harmed patients, created a substantial risk of harm to them, or diminished the standing of the medical profession as caregivers. *See Finucan,* 380 Md. at 601, 846 A.2d 377; *Banks,* 354 Md. at 74, 729 A.2d 376. The presence of one or more of these effects sufficiently ties the physician's misconduct to the exercise of medical judgment and duties to warrant a finding that it occurred "in the practice of medicine." *See Finucan,* 380 Md. at 598–99, 846 A.2d 377; *Banks,* 354 Md. at 62–64, 729 A.2d 376; *McDonnell,* 301 Md. at 436–37, 483 A.2d 76.

Given the blatant "on the job" sexual misconduct of Drs. Banks and Finucan, neither of those decisions definitively answers whether Dr. Cornfeld's misconduct occurred in the practice of medicine. We have not found a reported case considering whether a treating physician's dishonesty in hospital peer review or state disciplinary proceedings falls within "the practice of medicine." [9]

---

**9.** Although there are a number of cases and commentaries discussing whether false testimony given by a physician acting as an expert witness in a medical malpractice action falls within "the practice of medicine" for disciplinary purposes, that is not our case. *See, e.g.,* Jennifer A. Turner, *Going After the 'Hired Guns': Is Improper Expert Witness Testimony Unprofessional Conduct or the Negligent Practice of Medicine?,* 33 Pepperdine L.Rev. 275 (Jan. 2006) (collecting cases and advocating that state medical boards take disciplinary action against improper expert witness testimony); Russell M. Pelton, *Medical Societies' Self-Policing of Unprofessional Expert Testimony,* 13 Annual of Health L. 549 (2004) (advocating that medical profession has "the responsibility to discipline its members who testify irresponsibly as expert witnesses"); *Joseph v. D.C. Bd. of Medicine,* 587 A.2d 1085, 1091 (D.C.1991) ("Dr. Joseph's inflation of his credentials as an expert witness" constituted unprofessional conduct in the practice of medicine because it "bore directly on the question whether his medical diagnosis would be credited"); *Mo. Bd. of Registration for the Healing Arts v. Levine,* 808 S.W.2d 440, 443 (Mo.Ct.App.1991) (physician's allegedly false testimony as expert witness was not practice of medicine).

■ The Board's conclusion that Dr. Cornfeld's false statements to the hospital and the Board constituted "professional misconduct in the practice of medicine" has "considerable weight" in this Court, because the Board's expertise in interpreting and applying HO section 14–404(a) is "entitled to judicial respect," particularly in a case involving misconduct in a hospital setting. *See Finucan,* 380 Md. at 590, 846 A.2d 377; *Banks,* 354 Md. at 69, 729 A.2d 376. In this instance, we agree with the Board that Dr. Cornfeld's false statements "involved the manner in which [he] practiced medicine" and "the manner in which he treated a patient," such that they are "directly tied to" the "effective delivery of patient care."

Dr. Cornfeld stated under oath to his fellow physicians at MGH that, as a matter of routine, he expected the bovie machine "would be set at 40 or 50," when in fact he had given standing written instructions to the hospital, as well as specific instructions to operating room nurses on the day of the surgery, to set the machine at 70. Cornfeld made these false statements to peer reviewers at the hospital where he performed the surgery in question, and repeated them to Board investigators, in order to influence decisions concerning the quality of his medical care to a patient and his fitness to practice medicine at MGH specifically, and in Maryland generally.

We are persuaded that Cornfeld's dishonesty in hospital peer review proceedings and the Board investigation qualifies as unprofessional conduct in the practice of medicine. There can be no debate that a physician's lack of veracity regarding events in an operating room constitutes unprofessional conduct. Indeed, as this Court recognized long ago, fundamental principles of medical ethics require that "[a] physician shall deal honestly with patients and colleagues[.]" *Dr. K. v. State Bd. of Physician Quality Assurance,* 98 Md.App. 103, 110, 632 A.2d 453 (1993) (quoting Am. Med. Ass'n, *The Principles of Med. Ethics,* § 2), *cert. denied,* 334 Md. 18, 637 A.2d 1191, *cert. denied,* 513 U.S. 817, 115 S.Ct. 75, 130 L.Ed.2d 29 (1994); *see* COMAR 10.32.02.10 ("The Board may consider the Principles of Ethics of the American Medical Association").

Moreover, by its very nature, hospital peer review of medical care rendered to a surgical patient "relates to the effective delivery of patient care," and therefore constitutes the practice of medicine. The by-laws of MGH specifically required Dr. Cornfeld to participate in peer review, which is a standard duty in the modern practice of medicine.[10] *See, e.g.,* Susan O. Scheutzow, Sylvia Lynn Gillis, *Confidentiality and Privilege of Peer Review Information: More Imagined Than Real,* 7 J.L. & Health 169, 169 (1993)("Peer review of health care professionals has become a standard process in hospitals"). As every physician knows, hospital peer review is not merely a necessary condition to maintaining the privilege to treat patients at that hospital, but it also serves an important patient care purpose. *See, e.g., Brem v. DeCarlo, Lyon, Hearn & Pazourek, P.A.,* 162 F.R.D. 94, 97 (D.Md.1995)(by extending qualified immunity to physicians participating in peer review, "Maryland legislature sought to foster effective review of medical care and thereby improve the quality of health care"); *Bonner v. Sisters of Providence Corp.,* 194 Cal.App.3d 437, 239 Cal.Rptr. 530, 537 (1987) ("Hospital review boards ... review their physicians' conduct ... for the purpose of determining whether the medical staff members provide the quality of care the hospital requires").

---

**10.** State and federal laws effectively mandate that hospitals conduct peer review. In 1986, Congress enacted the Health Care Quality Improvement Act (HCQIA) "for the express purpose of 'improv[ing] the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior.' " *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 196, 680 A.2d 1067 (1996). By its own terms, the legislation was designed to redress " '[t]he increasing occurrence of medical malpractice' " by seeking " 'to improve the quality of medical care' " " 'through effective professional peer review.' " *Id.* (quoting 42 U.S.C. § 11101(3)). To advance that objective, "the HCQIA provides participants in peer review activities with qualified immunity from liability for monetary damages in suits brought by the physicians who were the subjects of these review activities." *Id.* at 196–97, 680 A.2d 1067; *see* 42 U.S.C. § 11111(a). To qualify for such immunity, the peer review must be undertaken, *inter alia,* "in the reasonable belief that the action was in the furtherance of quality health care[.]" 42 U.S.C. § 11112(a).

Dr. Cornfeld's false statements concerned his instructions for settings on the surgical instrument he used to operate, a matter that required his medical judgment in a specific surgical procedure. These misrepresentations were made to persons responsible for evaluating Cornfeld's medical care to patients at MGH. Such misrepresentations therefore were "directly tied" to medical "treatment" and "surgery," within the statutory definition of "practice medicine." *See* HO § 14–101(*l*); *McDonnell,* 301 Md. at 437, 483 A.2d 76. Indirectly, as well, such dishonesty "diminishes the standing of the medical profession as caregivers." *See Finucan,* 380 Md. at 597, 601, 846 A.2d 377; *Banks,* 354 Md. at 74, 729 A.2d 376.

■ The same false statements were made to the Board, a governmental agency responsible for investigating and disciplining physicians for professional misconduct. "The Board's mission [is] to regulate the use of physician's licenses in Maryland," *Dr. K.,* 98 Md.App. at 118, 632 A.2d 453, in order "to protect and preserve the public health[.]" *Comm'n on Medical Discipline v. Stillman,* 291 Md. 390, 405–06, 435 A.2d 747 (1981); *see Aitchison v. State,* 204 Md. 538, 544, 105 A.2d 495, *cert. denied,* 348 U.S. 880, 75 S.Ct. 116, 99 L.Ed. 692 (1954). Making a false statement to a physician disciplinary board meets the *Banks* "sufficiently intertwined with patient care" standard, *see Banks,* 354 Md. at 76, 729 A.2d 376, when the physician under investigation made the statement and it related to patient care provided by the same physician. This differs from the witness tampering by Dr. McDonnell in the course of a civil malpractice case, a proceeding whose purpose is to obtain compensation for the plaintiff, which is not brought for the purpose of maintaining high standards in the medical profession.

A contrary conclusion "would lead to unreasonable results." *See Banks,* 354 Md. at 75, 729 A.2d 376. To exclude dishonesty in hospital peer review proceedings as sanctionable misconduct in the practice of medicine would mean that lying directly to a patient about what occurred during her surgery would qualify as unprofessional conduct in the practice of medicine,

but lying to a hospital about the same surgery during peer review proceedings concerning that same patient would not qualify as unprofessional misconduct in the practice of medicine. A similar discordant result would follow if we were to hold that Cornfeld's false statement to the Board did not fall within the scope of practicing medicine. Such an anomaly would severely undermine the purpose of section 14–404.

We hold that the Board had a reasonable factual and legal basis to conclude that Cornfeld's lie, made under oath in his capacity as a treating physician, about his own medical judgment and performance in surgery, in order that his treatment of a patient's condition would be approved by peer reviewers and the Board, constituted unprofessional misconduct "in the practice of medicine."

## II.

### Delay In Board Investigation

HO section 14–401(j) addresses the length of a Board investigation:

(j)(1) *Time for disposition of complaint.*—It is the intent of this section that the disposition of every complaint against a licensee that sets forth allegations of grounds for disciplinary action filed with the Board shall be completed as expeditiously as possible and, in any event, within 18 months after the complaint was received by the Board. (2) **If the Board is unable to complete the disposition of a complaint within 1 year, the Board shall include in the record of that complaint a detailed explanation of the reason for the delay.** (Emphasis added.)

Dr. Cornfeld complains that "the Board did not complete its investigation or dispose of the complaint . . . within 18 months from the date the complaint was filed," and did not otherwise explain the reasons for the delay. The investigation was opened on January 12, 2000, but charges were not issued for more than three years, until November 21, 2003. Dr. Cornfeld contends that he repeatedly raised the untimeliness of the

investigation to the Board, but the Board failed to comply with either the statutory time frame or the statutory requirement that any extension beyond one year be explained in detail on the record. In his view, "[t]he Board would have there be no consequence at all for its failure to comply with the Medical Practice Act." The proper remedy, he contends, is dismissal of the charges for failure to comply with the statute.

 We agree with the Board that any viable complaint that Dr. Cornfeld may have had about the Board's delay and failure to explain, as required by section 14–401(j), does not merit dismissal of the charges. To be sure, we are troubled by the length of time between initial complaint and filing of charges, as well as the Board's apparent disregard of the "extension explanation" provision in the statute.[11] Nevertheless, we concur that this is another instance when the legislature's failure to include a penalty for failure to act within a prescribed time indicates that the provision is directory, rather than mandatory. *See, e. g., Md. State Bar Ass'n v. Frank,* 272 Md. 528, 533, 325 A.2d 718 (1974) (rule without sanction for violation is more likely to be directory); *Pope v. Sec'y of Personnel,* 46 Md.App. 716, 717, 420 A.2d 1017 (1980) ("one of the contextual factors relied upon ... to hold the use of 'shall' directory is when a statute provides no penalty for failure to act within a prescribed time"), *cert. denied,* 289 Md. 739 (1981).

 In *Solomon v. Bd. of Physician Quality Assurance,* 132 Md.App. 447, 456, 752 A.2d 1217, *cert. denied,* 360 Md. 275, 757 A.2d 811 (2000), this Court held that the legislative history of the 18 month period in section 14–401(j)(1) indicates that this time frame is directory, not mandatory. *See* 1988 Md. Laws, ch. 109 (providing that "time ... frames for ... completing the disposition of complaints ... are directory to the Board ... and may not be construed as a defense or bar to a complaint or any action on a complaint against a licensee

---

11. Cornfeld did not waive his complaint, as the ALJ's opinion makes clear.

in any proceedings arising out of th[e] Act"). For the same reason, we conclude that the ensuing explanation requirement in subsection (j)(2) is also directory rather than mandatory. It would be inconsistent to hold that failing to explain why an investigation is taking longer is mandatory. In accordance with HO § 14–405(g), therefore, "hearing of charges may not be ... challenged by any procedural defects alleged to have occurred prior to the filing of charges[,]" including complaints that the Board failed to comply with section 14–401(j).

Moreover, Dr. Cornfeld had a full and fair opportunity to be heard concerning the charges against him. He has never contended that the lack of explanation for the delay prejudiced him. These are not circumstances in which such prejudice might be presumed.

## III.

### Violation Of Standard Of Care

█ Dr. Cornfeld challenges whether there is substantial evidence in the record to support the Board's finding by clear and convincing evidence that he left an anesthetized patient "unattended" in the operating room. He points to a hospital form completed at the time of the incident, which states that he left the operating room at 11:35 and that Dr. Vincent entered at 11:35, as "more reliable evidence as to what occurred on October 28, 1999, than testimony of witnesses who were testifying from their recollection of an event that took place years in the past."

Moreover, Dr. Cornfeld asserts, the evidence shows that the patient was attended at all times in the OR by the anesthesiologist (Dr. Wei), the circulating nurse (Ms. Dickey), and a nurse technician (Ms. Calpin). In addition, he reiterates his testimony that "it is not unusual for the surgeon to leave the operating room before the patient wakes up" for a variety of reasons, including taking and viewing x-rays.

The Board counters with the following evidence:

- Dr. Vincent stated that Dr. Cornfeld was not in the operating room when he arrived.

- Nurse Sherry Dickey reported that Joan Fitzgerald, the nurse supervisor in the operating room, "told Dr. Cornfeld that we could not take the patient out of the OR until another doctor saw the patient. He said 'do what you have to do' and left the room."

- Ms. Calpin, a certified operating room technician during the biopsy, made a written statement shortly after the incident, stating that Dr. Cornfeld sutured the laceration, then "took his gown off & left the room. Dr. Vincent arrived a few minutes later[.]"

- Nurse Dickey also testified that "the data entry on the computer system" used to complete the form cited by Dr. Cornfeld "only allowed a five minute increment. And, basically, we rounded off lower or higher to the five minutes depending on what time it was."

- The Board's expert witness testified that the standard of care required that Dr. Cornfeld "should have stayed" in the operating room "until Dr. Vincent arrived. And then he could have explained to Dr. Vincent what happened and ask for Dr. Vincent's opinion if anything further needed to be done."

- MGH's Medical Staff Executive Committee concluded that "it was inappropriate" for Dr. Cornfeld "to leave the OR before the patient was extubated."

- MGH's OB/GYN Review Committee concluded that Dr. Cornfeld inappropriately "left an anesthetized surgical patient unattended."

We agree with the Board that the cited evidence provides a substantial factual basis for the Board's finding that Dr. Cornfeld violated the applicable standard of care. In particular, the Board was entitled to credit Nurse Dickey's explanation that the "11:35" arrival and departure times on the report cited by Dr. Cornfeld resulted from the five minute increment limitation on data entries. Moreover, Dr. Cornfeld's reliance on the 11:35 a.m. time report is undermined by his admission

that he "exited the operating room upon being informed that Dr. Vincent 'would be right there' as he left." As for the contention that leaving was acceptable, the Board had substantial evidence to reject that view, given the contrary opinions expressed by the Board's expert and the hospital peer reviewers.

## IV.

### Sanctions

Dr. Cornfeld complains next that "the sanction imposed by the Board ... is so disproportionate to his alleged offense as to constitute an abuse of discretion, and arbitrary and capricious agency action." In support, he points to his "long and fruitful career," apart from this "single procedure" on a patient who was not harmed during this "common and uncomplicated procedure." Moreover, he points out that the Board concurred with him that there was insufficient evidence to show "that the setting for the Bovie machine caused the burn" and that the disputes regarding laceration repair "were legitimate matters of professional disagreement." In Cornfeld's view, the sanction is simply too harsh for leaving the operating room just before Dr. Vincent arrived. Indeed, he contends, the patient "herself did not see this matter as a big issue, and continued to have confidence in Dr. Cornfeld seeking him out to deliver her next child."

This Court has held that an administrative agency with disciplinary and licensing authority "has broad latitude in fashioning sanctions within [those] legislatively designated limits," so that it may place conditions on any suspension or probation. *See Neutron Prods., Inc. v. Dep't of Environment,* 166 Md.App. 549, 584, 890 A.2d 858, *cert. denied,* 392 Md. 726, 898 A.2d 1005 (2006); *Blaker v. State Bd. of Chiropractic Examiners,* 123 Md.App. 243, 264–65, 717 A.2d 964, *cert. denied,* 351 Md. 662, 719 A.2d 1261 (1998). "The arbitrary and capricious standard ... sets a high bar for judicial intervention, meaning the agency action must be 'extreme and egregious' to warrant judicial reversal[.]" *Bd. of Physician*

*Quality Assurance v. Mullan,* 381 Md. 157, 171, 848 A.2d 642 (2004). Thus, if the sanction is "lawful and authorized," the Board "need not justify its exercise of discretion by findings of fact or reasons articulating why the agency decided upon the particular discipline." *Md. Aviation Admin. v. Noland,* 386 Md. 556, 581, 873 A.2d 1145 (2005).

 We cannot say as a matter of law that the sanctions against Dr. Cornfeld exceeded the discretionary range given to the Board. The Board has statutory authority to "place any licensee on probation or suspend ... a license" for violations of the Medical Practice Act. *See* HO § 14–404(a). Dr. Cornfeld violated the Act by inappropriately leaving the operating room and by misrepresenting his instructions to hospital personnel. We cannot say that suspension and long term probation for Cornfeld's breach of the standard of care and professional misconduct are so "extreme and egregious" as to warrant judicial intervention. *See Mullan,* 381 Md. at 171, 848 A.2d 642.

## V.

### Evidentiary Rulings

Dr. Cornfeld's final assignment of error concerns evidentiary rulings by the ALJ. The Administrative Procedure Act protects a party's right to "call witnesses," "offer evidence, including rebuttal evidence," "cross-examine any witness," and "present summation and argument." SG § 10–213(f). Although Dr. Cornfeld acknowledges that an ALJ may exclude evidence that is "incompetent, irrelevant, immaterial, or unduly repetitious," SG § 10–213(d), he contends that "an ALJ can go too far, ... and that is what occurred in this case," when she denied Dr. Cornfeld his "right to pursue any theories of the case."

Specifically, Dr. Cornfeld contends the following rulings crippled his defense:

- That he was not permitted to elicit testimony about an incident that occurred the day before the surgery at issue in these proceedings, which could have established the bias of the same operating room nurse and technician who

assisted him on October 28. The doctor proffered to the Board that, on that day, he performed a vaginal hysterectomy with the assistance of "several witnesses against him, in which the nurses failed to keep a catheter drained resulting in a hole in the patient's bladder."

• That he also was prevented from eliciting testimony on cross-examination that "these nurses and the scrub technician were smiling and giving high fives to each other on October 28, 1999 when Dr. Cornfeld left the operating room."

• Finally, that he was not permitted to "testify about what he believed to be the true motive behind his suspension of privileges at MGH—the hospital's unwritten policy to seek the retirement or removal of all doctors over the age of 70."

After reviewing the portions of the record cited by Dr. Cornfeld in support of these complaints, we cannot say that the Board denied Cornfeld his right to defend himself.

 Dr. Cornfeld cites only four pages of transcript in support of his claim that he was denied an opportunity to present evidence regarding the operating room incident on October 27. None of these support his complaint that the ALJ intentionally or unreasonably thwarted his presentation of evidence to support his "payback" theory of the case arising from the "day before" incident.[12]

 Moreover, we agree with the Board that the ALJ did not err in refusing to permit Cornfeld to question Peter

---

12. In the cited page of his opening statement, Cornfeld said that "the day before the same group of nurses were present when a catheter wasn't draining.... And because a hospital-appointed second assistant removed her retractor, a hole was put in the bladder. I put the hole in the bladder." We see no restriction by the ALJ here. In addition, this statement does not explain why the "day before" incident would be relevant to show bias by the same OR staff that he conflicted with in this incident.

In the cited page from Nurse Dickey's direct testimony, there are no questions by Dr. Cornfeld about "the day before" incident. In the cited page from Dr. Cornfeld's cross-examination of Nurse Dickey, Dr. Cornfeld asked: "When I left the room were you happy and jumping up and

Monge, the CEO of MGH, about the number of physicians over 70 years old who hold privileges at MGH, on the ground that none of the charges against Cornfeld concerned his age. Dr. Cornfeld proffered that such evidence "could be material because there is a law of age discrimination, and they would have to find an alternate . . . reason" for revoking his hospital privileges. The ALJ allowed Cornfeld to testify that MGH wanted him out, and that he had been urged to retire because he was over 70. This was sufficient to present his defense theory that the charges arising from the October 28 surgery were pretextual.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

down or smiling or give high-fives with the scrub tech?" The State's objection, for unspecified reasons, was sustained. Cornfeld never attempted to find out why he could not ask that question. Nor did he articulate to the ALJ why such evidence would be relevant.

In the cited page from Dr. Cornfeld's testimony, the ALJ interrupted when, after testifying about the incident, Cornfeld continued, "The day before, I had done-" The ALJ instructed Cornfeld, "Do not talk about the day before. We're only dealing with" the October 28 incident. Dr. Cornfeld did not protest or proffer any explanation for why that incident might be relevant to his defense.

Finally, in the cited page from Dr. Cornfeld's closing argument, there is no mention of the "day before" incident.