**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2171

September Term, 2013

WAYNE GARRITY, SR.

v.

MARYLAND STATE BOARD OF
PLUMBING

Zarnoch,
Reed,
Kenney, James A., III
    (Retired, Specially Assigned),

JJ.

Opinion by Zarnoch, J.

Filed: February 26, 2015

In this case of successive administrative enforcement actions brought by State agencies over a plumber's use of unlicensed employees, the appellant, Wayne Garrity, Sr. asks this Court to apply double jeopardy principles to bar imposition of a second civil penalty, but to reject agency resort to the short-cut of collateral estoppel to prevent a second administrative trial. In short, he simultaneously asserts claims of piling on and not piling on enough. Finding no foul, we affirm the Circuit Court for Baltimore City and uphold the enforcement action of the Maryland State Plumbing Board.

## FACTS AND PROCEEDINGS

Garrity worked as a plumber in Maryland for thirty-five years. For much of that time, he was a licensed master plumber and the sole manager of All State Plumbing, Inc. and in effective control, through his wife, of All State Plumbing, Heating & Cooling ("All State"). He was licensed by the Maryland State Plumbing Board ("the Plumbing Board"), created pursuant to Md. Code (1989, 2010 Repl. Vol.), Business Occupations and Professions Article (BO&P), §§ 12-301 *et seq.* (the Maryland Plumbing Act or MPA).

On February 23, 2012, the Consumer Protection Division of the Attorney General's Office (CPD) filed a Statement of Charges alleging that All State and Garrity had violated the Consumer Protection Act (CPA). [1] Specifically, they were accused of unfair and deceptive trade practices in violation of CL §§ 13-301 through 13-305. During a contested two-day hearing, an Administrative Law Judge considered eighty-four exhibits and heard from over twenty witnesses. Garrity did not testify. On November 7, 2012, the ALJ issued

---

[1] Md. Code (1975, 2013 Repl. Vol.), Commercial Law Article (CL), §§ 13-101 *et seq.*

a Proposed Decision finding that Garrity and All State had violated the CPA. No exceptions were taken. As a result, on January 3, 2013, the CPD's designee issued Findings of Fact and Conclusions of Law, noting that between 2005 and 2010, All State had employed two plumbers whose licenses had been revoked by the Board, and that while employed by All State, these plumbers had performed over 6,000 plumbing jobs while not being licensed. In addition, the CPD found that All State charged consumers between $100 and $175 for permits for certain plumbing services, but routinely failed to obtain required permits or schedule the required inspections of water heaters installed in at least 697 homes in Maryland.

The CPD also issued a Final Order concluding that All State and Garrity had committed at least 7,079 violations of the CPA by engaging in unfair or deceptive practices related to providing plumbing services. The CPD imposed a $707,900 civil penalty and assessed $35,000 for costs incurred in investigating and prosecuting the matter. The CPD also ordered Garrity to cease and desist from acts and omissions that violate the CPA and to pay into a restitution fund to be distributed by the CPD to qualified consumers. No judicial review of this decision was sought.

After reviewing the CPD's Final Order, the Plumbing Board opened a complaint against Garrity. After unsuccessful requests for documentation from Garrity, the Board issued a Charge Letter alleging that Garrity had violated BO&P § 12 3-12(a)(1)(iii) by the provision of incompetent and or negligent plumbing services; § 12 3-12(a)(1)(iv) by his failures to obtain permits required by local jurisdictions; § 12 3-12(a)(1)(vi) by having been found guilty of unfair trade practices; § 12 3-12(a)(1)(xi) by knowingly permitting

2

employees to work outside the scope of their licenses; and § 12 3-12(a)(1)(xii) by employing unlicensed persons to provide or assist in providing plumbing services in violation of § 12-602(a)(1).

On May 16, 2013, the Plumbing Board held an evidentiary hearing on these charges. Garrity was represented by counsel and refused to testify, called no witnesses, and offered no evidentiary exhibits. Instead, his attorney objected to the Board's consideration of the CPD's Findings of Fact and Final Order, insisting that the Board should be required to independently prove the facts alleged in the Charge Letter. The Board's counsel argued that Garrity was collaterally estopped from re-litigating the same facts that had already been determined by the CPD in its Final Order. The Board accepted this order into evidence, but did not rule on whether collateral estoppel applied, and Garrity did not seek postponement of the hearing pending the Board's ruling.

The Board issued a Final Decision and Order on July 9, 2013. Based on the factual findings in the CPD's Final Order and applying collateral estoppel, the Board concluded that Garrity had violated the provisions of the MPA as alleged in the Charge Letter. The Board revoked his master plumbing license and imposed a $75,000 civil monetary penalty. Garrity filed a Petition for Judicial Review in the Circuit Court for Baltimore City.[2] The circuit court upheld the action of the Plumbing Board and this appeal followed.

## QUESTIONS PRESENTED

Garrity asks:

---

[2] All State did not join in the petition and is not a party here.

1. Did the Final Order of the CPD meet the legal requirement of a "final judgment," as established in *Culver v. Md. Ins. Comm'r*, 175 Md. App. 645 (2007), so that the Plumbing Board could properly use it, in lieu of actual evidence to meet its own burden of proof in its later case against Garrity?

2. Did the State of Maryland violate Garrity's double jeopardy protections under the 5th Amendment to the U.S. Constitution, when, for the same alleged conduct, its Plumbing Board punished him a 2nd time with a $75,000 civil penalty right after its CPD had already punished him a first time with a $707,900 civil penalty?

## DISCUSSION

### I. Standard of Review

In *Maryland Aviation Administration v. Noland,* 386 Md. 556 (2005), the Court of Appeals explained:

> A court's role in reviewing an administrative agency adjudicatory decision is narrow; it is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.

*Id.* at 571–72 (Citations and quotations omitted). Garrity does not contest the sufficiency of evidence. Instead, he argues that the Board erred in its legal determination that Garrity was collaterally estopped from calling for the Board to investigate the facts established in the CPD's Final Order.

We typically give "considerable weight" to an agency's interpretation of the statutes it administers. *Id.* at 572. The application of collateral estoppel, however, is a separate legal question, subject to *de novo* review. *Shader v. Hampton Imp. Ass'n, Inc.*, 217 Md. App. 581, 605 (2014); *see Spencer v. Maryland State Bd. of Pharmacy*, 380 Md. 515, 528-29 (2004). The same is true of whether multiple civil penalties violate the Fifth Amendment to the U.S. Constitution. Thus, we must determine whether the Board's

4

conclusions are legally correct, without deference to its actions. *Gebhardt & Smith LLP v. Maryland Port Admin.*, 188 Md. App. 532, 564 (2009).

## II. Offensive Nonmutual Collateral Estoppel

Garrity characterizes the Plumbing Board's reliance upon the CPD decision as use of "offensive non-mutual collateral estoppel." This is a version of the doctrine of collateral estoppel that arises when the plaintiff in the second case seeks to foreclose the defendant from re-litigating an issue the defendant has previously litigated unsuccessfully against other plaintiffs.[3] *Rourke v. Amchem*, 384 Md. 329, 341 (2001). He claims that there is not "one single reported case in Maryland where offensive non-mutual collateral estoppel had actually been upheld, wherein the predicate, fact-finding forum was . . . an administrative agency." In other words, he asserts that an agency may not rely on the facts found by a different agency, even when both adjudications involve the same defendant and the same issue. Garrity argues that the CPD is not "a real court," and therefore cannot issue a "final judgment." The Board dismisses this as a "largely unsupported and purely semantic argument . . . ignoring clear judicial precedent."

Collateral estoppel may be used offensively or defensively. The Court of Appeals has followed a four-part test that must be satisfied for the doctrine of collateral estoppel to apply:

> 1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

---

[3] Even though both adjudications involved "state" agencies, no party has advanced the argument that the collateral estoppel is "mutual."

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*Burruss v. Bd. of Cnty. Commissioners of Frederick Cnty.*, 427 Md. 231, 249-50 (2012) (Citation omitted). Garrity does not contest prongs 1 or 4. Garrity's misrepresentations about the qualifications of his plumbers and procurement of permits constituted violations of both the CPA and the MPA; thus, "identical" issues were before the CPD and the Plumbing Board. Further, Garrity was the party charged in both actions, and he was given a fair opportunity to be heard before the CPD and the Board, yet refused to testify or present evidence. Moreover, he had an opportunity to seek judicial review of the CPD's Final Order, but did not.

Garrity's remaining arguments are unpersuasive. First, collateral estoppel gives preclusive effect to the findings of an adjudicator, even between different parties, in a subsequent proceeding on the same issue. Second, administrative agencies, acting in a quasi-judicial capacity, are treated as "courts" that can issue orders and rulings for the purposes of collateral estoppel. For the reasons set forth below, we believe that because the CPD thoroughly examined Garrity's violations of the CPA and the MPA, the Plumbing Board did not err in relying on those findings in reaching its own conclusions.

### a. When is Offensive Nonmutual Collateral Estoppel Appropriate?

Under the doctrine of collateral estoppel, " '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential

6

to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'" *Murray Int'l Freight Corp. v. Graham,* 315 Md. 543, 547 (1989) (quoting *Restatement (Second) of Judgments* § 27 (1982)) (hereinafter *Restatement*).[4] That is, if Plaintiff A proves a Defendant's violation before a court, Plaintiff B may rely on those findings in a separate adjudication against the same Defendant in a different court. *See Restatement* § 29 ("A party precluded from relitigating an issue with an opposing party . . . is also precluded from doing so with another person *unless* the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue"[5]) (Emphasis added).

Like *res judicata*, collateral estoppel is based on "the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Dep't of Human Res. v. Thompson*, 103 Md. App. 175, 194 (1995) (quoting *Astoria Federal S & L v. Solimino,* 501 U.S. 104, 107 (1991)). The purpose of this rule is to avoid "the expense and vexation of multiple lawsuits, conserve judicial resources, and

---

[4] "[W]e observe that the Court of Appeals gives considerable, and at times, persuasive weight to the position taken by the American Law Institute in Restatement (Second) of Judgments." *Bryan v. State Farm Mut. Auto. Ins. Co.*, 205 Md. App. 587, 602 (2012); *see, e.g.*, *Leeds Fed. Sav. & Loan Ass'n v. Metcalf,* 332 Md. 107, 120 (1993) (§§ 27–29).

[5] Garrity does not argue that he was unable to fairly litigate the issue in the CPD hearing.

foster reliance on judicial action by minimizing the possibilities of inconsistent decisions."

*Bryan v. State Farm Mut. Auto. Ins. Co.*, 205 Md. App. 587, 592 (2012).

Garrity argues that the Board may not rely on findings of fact from the CPD hearing, noting that there was not "complete mutuality between the parties" because the adjudications involved two different state agencies. Garrity misstates the law here. Although traditionally the Court held that all four requirements must be met, *i.e.*, that there was "mutuality of parties," *see Pat Perusse Realty Co. v. Lingo*, 249 Md. 33, 45 (1968), the Supreme Court has said that "offensive nonmutual collateral estoppel" may apply to subsequent proceedings between two distinct parties. *See Parklane Hosiery*, 439 U.S. at 329-30 (1979); *Rourke*, 384 Md. at 350.

In the context of civil actions between private, non-governmental parties, courts have noted two general concerns that could limit the application of this doctrine. The Court of Appeals followed *Parklane* in *Rourke*, 384 Md. at 350 and reiterated the Supreme Court's two major policy concerns with the application of the doctrine: judicial economy and fairness.

The *Rourke* Court summarized *Parklane*, 439 U.S. at 330-31, and explained this first concern:

> First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. The Court explained that, whereas defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action, if possible, offensive collateral estoppel creates a contrary incentive: [s]ince a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment.

8

*Rourke*, 384 Md. at 350 (Quotation omitted).

Second, the Court of Appeals was concerned with the fairness of offensive nonmutual collateral estoppel, including:

> (1) that [i]f a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable, (2) offensive use may be unfair as well "if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant, and (3) such use may be unfair where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result."

*Rourke*, 384 Md. at 350 (Quotation omitted).

In light of these twin concerns of judicial economy and fairness, we recognize that the Court of Appeals has never rejected offensive nonmutual collateral estoppel as a doctrine, but merely found it inappropriate to the specific facts of the cases before it. In *Rourke*, the Court held the doctrine must be applied consistent with the conflict of laws principles. In that case, which arose from "consolidated settlement of several hundred asbestos-related personal injury and wrongful death actions," the Court considered whether to give "common law collateral estoppel effect to a judgment of the Supreme Court of Virginia involving none of the plaintiffs and only three of the thirteen defendants in this case." *Id.* at 332-33. Because "under the Maryland law of conflict of laws, the *res judicata* effect to be given to the judgment of another State is that which the judgment would have in the State where it was rendered," and Virginia did not recognize "offensive non-mutual collateral estoppel," the Court rejected its use. *Id.* at 342.

The Court has found it unfair to apply this doctrine where the predicate court's judgment was reached through a lower standard of proof, or if the court is acting in a non-judicial role. This is common in the context of attorney discipline cases, and as such, courts rarely apply this version of collateral estoppel in that context. *See Attorney Grievance Comm'n of Maryland v. Bear*, 362 Md. 123 (2000) ("Jurisdictions that have dealt with the precise issue presented by this case almost uniformly refuse to give preclusive effect to issues decided in a civil case under a preponderance of the evidence standard in a subsequent attorney discipline proceeding.") In *Bear*, the Court refused to adopt the findings of a District of Columbia court because the "original findings of fact to which preclusive effect is sought to be given were made under a less stringent standard of proof than is required in an attorney disciplinary action." *Id.* at 125. And in *Attorney Grievance Comm'n v. Miller,* 310 Md. 163 (1987), the doctrine was found inappropriate where a federal appellate court was not sitting as a judicial tribunal in a disciplinary proceeding but was conducting a judicial review of an agency decision. *Id.* at 171-72. The issue for the Court was whether Miller was guilty of misconduct and should be disciplined; however, the D.C. Circuit was only reviewing a federal agency's decision under an arbitrary and capricious standard. *Id.* at 172.

Where the burdens of proof and the alleged conduct at issue are the same, however, other States have upheld the use of offensive nonmutual collateral estoppel in a subsequent attorney disciplinary action. *See, e.g., Office of Disciplinary Counsel v. Kiesewetter*, 585 Pa. 477, 481 (2005) (Disbarment as a result of a 1994 federal civil jury verdict entered against respondent for fraud). And in *In re Caranchini*, 956 S.W.2d 910, 913 (Mo. 1997),

10

the Missouri Supreme Court relied on a federal court's finding that an attorney had made unsupported and frivolous arguments in its disciplinary proceeding.

A different fairness concern arose in *Burruss*, where the Court also found it unfair to apply offensive nonmutual collateral estoppel because the predicate ruling was legally incorrect. 427 Md. at 252. In that case, plaintiffs in Anne Arundel and Frederick County filed separate actions to challenge the legal standard to assess the authenticity of petition signatures. After the trial judge in the Anne Arundel County case adopted a "sufficient cumulative information" standard, the Frederick County plaintiffs sought to apply that ruling in their case. The Court of Appeals observed that the defendants to the action were different, so the doctrine could not apply.

Although initially stating that the Court had "not, since we issued our opinion in *Rourke*, adopted or applied the doctrine of offensive nonmutual collateral estoppel," it noted that "we deem the Supreme Court's analysis in *Parklane* persuasive." 427 Md. at 252. Echoing *Rourke*, the Court in *Burruss* examined the judicial economy and fairness concerns, and found that the Anne Arundel court was legally incorrect, *id.*, as the Court of Appeals had determined that same year in *Maryland State Bd. of Elections v. Libertarian Party of Maryland*, 426 Md. 488, 514-15 (2012). The Court concluded that

> [i]t would be unfair to bind Respondents to an incorrect interpretation of the law, as determined by another trial court, that could have been, and should have been, interpreted correctly by that trial court. Furthermore, this Court's recent holding in *Libertarian Party* reaffirmed that the petition signature requirements in § 6–203(a) [of the Election Law Article] are mandatory, and it would be unfair to bind Respondents to an interpretation of the law inconsistent with our holding in that case. Therefore, we decline to adopt the doctrine of offensive non-mutual collateral estoppel in the case *sub judice*.

*Id.* at 252. We agree with the reasoning of the Court in *Burruss*, but do not see how it precludes application of offensive nonmutual collateral estoppel here.

This Court has upheld use of this doctrine in a case somewhat similar to this one.[6] In *Culver*, we concluded that the Maryland Insurance Agency (MIA) could rely on the Attorney Grievance Commission's findings when it revoked Culver's insurance license. *Culver*, 175 Md. App. 645. We noted that there was no concern that the MIA

> would adopt a "wait and see" attitude toward the first action. . . because the MIA is not a plaintiff seeking a windfall without any work. Rather, as a regulatory body, the MIA is charged with protecting consumers from untrustworthy insurance producers by revoking or denying their licenses. When the MIA discovered that the highest court of this state had found that Culver acted dishonestly, it refused to allow appellant to relitigate the underlying facts found by that Court. The MIA's actions did not constitute the kind of "wait and see" attitude that troubled the *Parklane Hosiery* court.

*Id.* at 656.

Here, two separate state agencies sought to prosecute a licensee for the same illegal course of conduct. Unlike private parties, the CPD and the MSPB could not join their proceedings together, because administrative agencies can only adjudicate violations of their own statutes. For this reason, offensive nonmutual collateral estoppel is appropriate when the plaintiffs are two government agencies unable to jointly bring their case in a single proceeding.

We also found in *Culver* that the doctrine would not be unfair:

> The Court's second concern—fairness to the defendant—contemplates three scenarios in which the use of offensive nonmutual collateral estoppel would be unfair to the defendant. None of the scenarios are here present. Appellant

---

[6] In *Culver*, the predicate judgment was that of a court, not an administrative agency. *See* discussion on pp. 14-18.

12

had every "incentive to defend vigorously" in the action that resulted in his disbarment. Similarly, the present case is not one where "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." Nor is this a case in which procedural protections afforded in the later case may lead to a result inconsistent with the prior action. In sum, application of collateral estoppel principles to the case *sub judice* would satisfy all of the concerns identified in *Parklane Hosiery* and reiterated in *Rourke.*

*Id.* at, 656-57. In this case, Garrity was not being sued for "small or nominal damages," but the CPD adjudication resulted in more than $700,000 in civil penalties. This fine, for a small business owner, was hardly nominal, and Garrity had every incentive to defend his case.

The additional fairness concerns raised in *Rourke* and *Parklane* are not present here. There is no risk that "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Parklane,* 439 U.S. at 330. That was clearly not an issue, because there were no prior judgments favoring Garrity. Further, the CPD's determination was not incorrect as a matter of law, *see, e.g.*, *Burruss*, 427 Md. at 252.

Nor do we find that there are different "procedural opportunities." *Rourke v. Amchem Products, Inc.*, 384 Md. at 350; *see also Bear*, 262 Md. at 125. Again, in this case, where the two "plaintiffs" were two state agencies, and both held administrative hearings, there were not distinct "procedural opportunities." Garrity argues that hearsay would have been admitted in an administrative hearing, but fails to state how he was

prejudiced in this regard.[7]  The mere fact that hearsay might have been allowed in both the

CPD and the MSPB hearings is irrelevant, as he had the same procedural opportunities in

both forums.

Our decision in *Culver* is consistent with the discussion of fairness in *Parklane*,

*Rourke*, and subsequent cases.  As we recently observed, in declining to permit collateral

estoppel, "a plaintiff who invokes nonmutual collateral estoppel against a defendant does

so offensively, and may proceed so long as raising the prior case against the defendant(s)

in the action does not offend the *Parklane* factors."  *Shader v. Hampton Imp. Ass'n,* 217

Md. App. 581, 607-08 *cert. granted*, 440 Md. 225 (2014).  We also note that this case and

*Culver* both involved Maryland administrative agencies applying statutes designed to

protect consumers in highly-regulated industries.  We see no unfairness here in preventing

Garrity from relitigating the question of his deceptive plumbing practices.

**b.**     **Finality of the CPD Order**

We also reject Garrity's second argument that the CPD is not a "court" and that

therefore collateral estoppel cannot apply.  He argues that *Culver* established the outer

---

[7] Also, Garrity has not identified any hearsay evidence introduced in either agency
proceeding.  *See Commonwealth v. Two Parcels of Land*, 724 N.E.2d 739, 744-45 (Mass.
App. 2000) (rejecting a similar hearsay contention).

limits for offensive mutual collateral estoppel[8]: an administrative adjudication can adopt a prior judicial determination, but not another administrative one.

Both federal and Maryland courts have long held that a factual finding of an administrative agency adjudication is "final" and thus preclusive, "if it determines or concludes the rights of the parties, or if it denies the parties means of further prosecuting or defending their rights and interests in the subject matter proceedings before the agency, thus leaving nothing further for the agency to do." *Maryland Comm'n on Human Relations v. Baltimore Gas & Elec. Co.*, 296 Md. 46, 56 (1983) (citing federal and state authorities).

The Court of Appeals will give preclusive effect to "some administrative agencies performing quasi-judicial functions." *Batson v. Shiflett*, 325 Md. 684, 703 n. 7 (1992); *see Maryland Aggregates v. State,* 337 Md. 658, 678 (1995) ("[A]n agency in the executive branch may ordinarily perform adjudicatory functions in harmony with the principle of separation of powers provided that there is an opportunity for judicial review of the agency's final determination.") Similar principles apply to collateral estoppel. *See Batson*, 325 Md. at 704 ("Thus, current Maryland law on the preclusive effect of administrative agency decisions, under principles of *res judicata* or collateral estoppel, incorporates parallel considerations."); *Restatement* § 83(1) ("a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of *res judicata*, subject to the same exceptions and qualifications, as a judgment of a court"). The

---

[8] *See* n. 6 *supra.*

*Restatement* suggests that the formality and purpose of the hearing will determine whether it can be used in subsequent proceedings:

> Where an administrative forum has the essential procedural characteristics of a court, therefore, its determinations should be accorded the same finality that is accorded the judgment of a court.
>
> . . .
>
> For example, *within the context of a licensing hearing it may be disputed whether or not the licensee engaged in a specified course of conduct on a particular occasion, where engaging in the conduct is relevant to the licensure question*; determination of that issue can be accorded preclusive effect in later litigation even though the grant or denial of the license as such is not a matter of legal right. If an issue has thus been formulated, and if the procedure for resolving it is substantially similar to that used in judicial adjudication, the agency's determination of the issue should be given preclusive effect in accordance with the rules of res judicata.

*Restatement* § 83 cmt. b (Emphasis added).

In *Batson,* the Court of Appeals said that whether "an administrative agency's declaration should be given preclusive effect hinges on three factors: (1) whether the [agency] was acting in a judicial capacity; (2) whether the issue presented to the district court was actually litigated before the [agency]; and (3) whether its resolution was necessary to the [agency's] decision." 325 Md. at 701 (Quotation omitted) (alteration in original).[9]

Applying the same requirements of *Batson* here, we find that the CPD's findings had preclusive effect in the Board's adjudication. First, the agency was acting in its judicial

---

[9] This test was first articulated by the Ninth Circuit in *Exxon Corp. v. Fischer,* 807 F.2d 842, 845-46 (9th Cir. 1987), and is in this context often referred to as the "*Exxon* test."

capacity. *Batson*, 325 Md. 684 at 705. ("By conducting a hearing, allowing the parties to present evidence and ruling on a dispute of law, the [agency] acted in a judicial capacity.") (Quotation and citations omitted). The CPA clearly grants the CPD adjudicative powers to the CPD. *See* CPA § 13-206. During these proceedings, Garrity had the opportunity to testify, but refused. He had the right to call witnesses in his defense, but chose not to. The CPD offered twenty-four witnesses and eighty-four exhibits to establish Garrity's violations. No judicial review was sought. *See Bellermann v. Fitchburg Gas & Elec. Light Co.*, 18 N.E.3d 1050, 1069 (Mass. 2014) ("Nor does FG & E's decision not to appeal from the DPU's adjudications render the application of issue preclusion improper.")

Second, the "issue" was actually litigated before the agency, in this case, the CPD. In *Batson*, the Court of Appeals explained: "[i]t must appear that the precise issue was raised and resolved in the former proceeding." *Id.* at 706. Here, the issue presented to the Board was the same issue presented to the CPD—whether Garrity deceived his customers through the use of unlicensed plumbers or overcharged customers for unpermitted services. Had the Board not accepted the CPD's findings, the Board would have needed to begin the entire fact-finding process anew, interviewing the same customers and the same employees to determine whether Garrity provided unlicensed plumbers or billed consumers for permits he had never obtained. Under these circumstances, a second round of investigations would have served only to inconvenience witnesses and waste agency resources.

Third, it is quite apparent that it was "necessary" for the CPD to establish findings of Garrity's violations in order to issue its order. *See id.* at 707-08 (1992) (citing 18 C.

17

Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4421, at 192 (1981) ("A factual issue is necessary to the determination only if its resolution is required to support the judgment entered in the prior proceeding.")) In sum, the Board was correct in rejecting Garrity's insistence that the agency was required to re-litigate his numerous violations of the law before revoking his license and imposing a monetary penalty.

It is settled, then, that for purposes of finality, both the CPD and the Board are adjudicators whose decisions are subject to the rule of collateral estoppel. Garrity, argues that no court in any other jurisdiction has blessed the use of nonmutual collateral estoppel when used by one government agency to accord collateral estoppel effect to the decision of another. This is not entirely true. For example, in *High Country Res. v. F.E.R.C.*, 255 F.3d 741, 742 (9th Cir. 2001), the U.S. Court of Appeals for the Ninth Circuit rejected a challenge to FERC's reliance on a determination by the United States Forest Service to support the denial of license applications for hydroelectric projects on tributaries of a river. However, the applicant's unsuccessful challenge was premised on the limited ground that FERC was bound by an earlier Forest Service determination and thus, could not rely on the later administrative determination. *Id.* at 747-48.[10]

---

[10] It would also appear that the *Restatement* contemplates the possibility of successive administrative adjudications over the same claim. *See* § 83(3) ("An adjudicative determination of a claim by an administrative tribunal does not preclude relitigation in another tribunal of the same or a related claim based on the same transaction if the scheme of remedies permits assertion of the second claim notwithstanding the adjudication of the first claim.")

18

Nevertheless, we see no reason why this doctrine should not apply in this setting. In the scope of this proceeding, the CPD and the Board served similar roles: to protect the public from the unfair and deceptive provision of plumbing services. In the course of the investigation, the CPD called numerous witnesses and performed a detailed review of business records and found, among other things, that Garrity had charged consumers for permits he did not obtain and sent unlicensed employees to perform plumbing services into people's homes. Garrity presented no evidence to contradict the CPD's claims during this proceeding. Given these extensive findings and Garrity's decision not to defend against the charges in the first proceeding, it was not unfair for the Board to decline to set forth additional evidence to establish the exact same set of facts. To do so would have wasted judicial resources and delayed the Board from taking corrective action to protect the public and to deter other licensees from engaging in similar conduct. Accordingly, the Plumbing Board did not err in applying the CPD findings of fact in its license revocation hearing.

### III.    Double Jeopardy

### a.    Introduction

Garrity challenges the multiple civil penalties imposed upon him as a violation of the Double Jeopardy Clause of the Fifth Amendment of the U.S. Constitution.[11] We disagree. Agency penalties are generally upheld, because "an administrative agency with disciplinary and licensing authority has broad latitude in fashioning sanctions within [those] legislatively designated limits." *Cornfield v. Board of* Physicians, 174 Md. App.

---

[11] He has not challenged his license revocation.

19

456, 486 (2007) (Quotation omitted).

The State Government Article (SG), Md. Code (1984, Repl. Vol. 2009) § 10-222, governs the scope of judicial review of final administrative agency decisions where the agency is acting in a "quasi-judicial" capacity. *Spencer*, 380 Md. at 527. A punishment will not be disturbed on appeal unless it is "so extreme and egregious that the reviewing court can properly deem the decision to be arbitrary or capricious." *Id.* at 531. The MPA grants the Board authority to discipline licensees by revoking licenses or imposing a civil monetary penalty of up to $5,000 per violation. *See* MPA § 12-312.

Garrity contends that the civil monetary penalty violates the Fifth Amendment's double jeopardy prohibition because he had already been fined $707,900 for his violation of the CPA. The Board contends that the fine is necessary to put the public on notice of Garrity's violations and as a "catharsis for the profession and protection for the public."

**b.      Impact of *Hudson v. U.S.*, 522 U.S. 93 (1997)**

The Double Jeopardy Clause provides that no "person [shall] be subject for the same offence [sic] to be twice put in jeopardy of life or limb." "The Clause protects only against the imposition of multiple *criminal* punishments for the same offense, and then only when such occurs in successive proceedings." *Id.* at 99 (Quotations and citations omitted); *see also United States ex rel. Marcus v. Hess,* 317 U.S. 537, 548-49 (1943) ("Only" "criminal punishment" "subject[s] the defendant to 'jeopardy' within the constitutional meaning");

20

*Breed v. Jones,* 421 U.S. 519, 528 (1975) ("In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution").

At the outset, we note that Garrity has not been twice charged with the same offense; the CPD sanctioned him for violation of the CPA, and the Board sanctioned him under the MPA. However, Garrity views the two agency's punishments as aimed at the same offenses.

"Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction." *Id.* at 99 (Citation omitted). Determining the civil or criminal nature of a penalty involves two steps. First, we must "ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Id.* at 99. (Quotation omitted). Second, even if the legislature intends for the penalty to be civil, "we have inquired further whether the statutory scheme was so punitive either in purpose or effect, as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Hudson,* 522 U.S. at 99 (Quotations and citations omitted).

On this first question, the MPA is clear that the revocation of a license is a civil penalty. MPA § 12-607, "Fines and Penalties," provides that a person who violates §§ 12-501, 601-606 is "guilty of a misdemeanor" and provides for punishments of fines or imprisonment. MPA §§ 12-607 (a) - (c). Subsection (d), however, omits any reference to criminal culpability, and instead sets forth multiple factors that the Board may consider in setting a $5,000 penalty, including, among other things, "(i) the gravity of the violation; (ii) the good faith of the violator; (iii) the quantity and gravity of previous violations by the

21

same violator." MPA § 12-607(d)(2). This language is consistent with SG § 10-1001, which sets forth general guidelines on when an agency may assess a civil penalty. That Section provides that to "impose a civil penalty," the agency "shall consider the following in setting the amount of the penalty: (1) the severity of the violation for which the penalty is to be assessed; (2) the good faith of the violator; and (3) any history of prior violations." SG § 10-1001(b). We note the similarity of these standards and conclude that the "penalty" under MPA § 12-607(d) is a "civil penalty" as described under SG § 10-1001.

Read together, these two Sections clearly distinguish criminal penalties for "misdemeanor[s]" and the penalties imposed through license revocation. Neither the CPD nor the Board found Garrity had committed one of the offenses enumerated in §12-607. Rather, he was punished under §12-312 for his fraudulent action and violation of other requirements, such as obtaining permits for work.

For the second consideration, "only the clearest proof could suffice to establish the unconstitutionality" of governmental action on the basis of a violation of double jeopardy." *United States v. Ward*, 448 U.S. 242, 248-49 (1980) (Quotation and citations omitted). "In making this latter determination," the Supreme Court identified the following "useful guideposts," such as:

(1) [w]hether the sanction involves an affirmative disability or restraint;

(2) whether it has historically been regarded as a punishment;

(3) whether it comes into play only on a finding of *scienter*;

(4) whether its operation will promote the traditional aims of punishment-retribution and deterrence;

(5) whether the behavior to which it applies is already a crime;

22

(6) whether an alternative purpose to which it may rationally be connected is assignable for it; and

(7) whether it appears excessive in relation to the alternative purpose assigned.

*Hudson*, 522 U.S. at 99-100 (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–169 (1963)). Critically, "no one factor should be considered controlling as they "may often point in differing directions." *Hudson*, 372 U.S. at 100 (quoting *Kennedy*, 372 U.S. at 169). Furthermore, "these factors must be considered in relation to the statute on its face, and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 100 (Quotations omitted).

Garrity does not argue specifically which, if either, of the respective CPA or MPA penalties is criminal. He relies instead on *United States v. Halper*, which held that the Double Jeopardy Clause applied to the imposition of any kind of "punishment." 490 U.S. 435, 448 (1989). In defining punishment, the Court there focused on the traditional "goals of punishment," namely, "retribution and deterrence." *Id.* The *Hudson* Court, however, noted that in this respect, *Halper*'s "deviation from longstanding double jeopardy principles was ill considered" and that "*Halper's* test for determining whether a particular sanction is punitive,' and thus subject to the strictures of the Double Jeopardy Clause, has proved unworkable." *Hudson*, 522 U.S. at 101-02. The Court reasoned that "[i]f a sanction must be "solely" remedial (i.e., entirely nondeterrent) to avoid implicating the Double Jeopardy Clause, then no civil penalties are beyond the scope of the Clause." *Id.* at 102. In sum, civil penalties may be non-punitive for the purposes of evading double jeopardy concerns, even if their purpose is to deter future violations of the statute.

23

In *Ward v. Dep't of Pub. Saf. Corr. Servs.*, 339 Md. 343 (1993), the Court of Appeals explained that the reviewing court should focus on whether the penalty is retributive or deterrent in nature; the former is punitive, the latter is not. *Id.* For this reason, the revocation of a license is not "punishment" where the revocation is done to protect the public. *See State v. Jones*, 340 Md. 235, 251 (1995) (holding that revoking a driver's license for refusing to take a breath alcohol test was non-punitive because the purpose of the provision was to protect the public from dangerous drivers). Simply because a defendant considers a revocation to be punishment does not make it so. *Id.* at 249.

Moreover, the Supreme Court has clearly stated that "neither money penalties nor debarment has historically been viewed as punishment." *Hudson*, 522 U.S. at 104. As the Court has "long recognized . . . revocation of a privilege voluntarily granted, such as a debarment, is characteristically free of the punitive criminal element." Similarly, "the payment of fixed or variable sums of money [is a] sanction which ha[s] been recognized as enforceable by civil proceedings since the original revenue law of 1789." *Id.* (Quotations omitted).

It is readily apparent under the *Hudson* factors that the Board did not issue a "punishment." The purpose of both statutes is to "protect the public" and provide for high-quality professionals. *See Hudson*, 522 U.S. at 99. To do this, monetary penalties are necessary not only to remedy the harm done to the public, but also to deter future violations. Additionally, a monetary punishment itself is not "an affirmative disability or restraint." *See id.* Nor has it "historically been regarded as a punishment," nor do the texts of the statutes require a "finding of *scienter*." *See id.* Although monetary penalties may further

24

"traditional aims of punishment-retribution and deterrence," *Hudson* explicitly chastised the *Halper* Court for elevating this factor above others. *Id.* at 100, 101 (noting in *Halper* "the Court elevated a single *Kennedy* factor—whether the sanction appeared excessive in relation to its nonpunitive purposes—to dispositive status." Moreover, making false statements or employing unlicensed plumbers is not "already a crime." *See id.* Nor is there an "alternative purpose to which it may rationally be connected . . . assignable for it"; in other words, the reason for this fine is clear. Finally, each violation of the CPA and MPA may be as much as $5,000; Garrity was found to have engaged in over 7,000 separate violations. Ultimately, he was only fined $707,900 and $75,000. These amounts, in light of what he could have potentially been fined, do not appear excessive. Garrity may perceive these fines, though considerable, as a form of punishment. Yet whether a penalty seems like a punishment to the violator is immaterial; the Supreme Court has "long recognized that the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, 'in common parlance,' be described as punishment." *Hudson*, 522 U.S. at 98-99 (Quotations and citations omitted).

Accordingly, because Garrity has not been charged with any crime, the multiple civil monetary penalties are not "punishments" and do not violate the Double Jeopardy Clause of the Fifth Amendment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**